EMMA W. BLACKSTONE v. THE STANDARD LIFE &
ACCIDENT INSURANCE COMPANY.

*Accident insurance—Suicide—Insanity.*

1. Suicide by a person *non compos* does not come within the for-
feiture clause of an accident insurance policy providing that
no claim shall be made thereunder when death or injury may
have been caused by *suicide.*

2. The following propositions are summarized from the opinion of
Mr. Justice LONG:

*a*—We are bound in all cases to assume that the jury have
done no legal wrong when acting within their province. The
credibility of witnesses, the strength of their testimony, its
tendency, and the proper weight to be given to it, are matters
peculiarly within their province. To take from them this right
is but usurping a power not given. *Conely v. McDonald,* 40
Mich. 158.

*b*—Every person is presumed sane, and the burden is upon
the party asserting the contrary to establish insanity.

*c*—Practically, all the cases agree in holding in the language
of the supreme court of Massachusetts in *Cooper v. Ins. Co.,*
102 Mass. 227, that there is no substantial difference of signi-
fication between the phrases "shall die by his own hand,"
"shall commit suicide," and "shall die by suicide."

*d*—The rule of construction, though not always recognized
by the cases, is that the condition forfeiting a life insurance
policy in case of suicide, being in the nature of a penalty or for-
feiture, must be strictly construed. *Ins. Co. v. Moore,* 34 Mich.
45.

*e*—Upon the question of voluntary suicide, intentionally com-
mitted by a sane man in the possession of his faculties, know-
ing how to adopt means to ends, and conscious of the immo-
rality of the act, there is no difference of opinion; and all
authorities agree that *such* self-destruction is within the exemp-
tion; and they likewise agree that an accidental death,—as by
taking poison by mistake, or shooting one's self with a pistol,
supposing it not to be loaded, or falling from a building, or
death happening in any way by the unintended act of the party
dying,—is *not* within the exemption.

*f*—Insurers may always frame contracts of insurance to suit
themselves, and may, if they choose, insert express stipulations

to the effect that insanity shall not in *any case* prevent avoidance by the suicide of the insured.

Error to Lenawee. (Lane, J.) Argued January 17, 1889. Decided April 24, 1889.

*Assumpsit* upon accident insurance policy. Defendant brings error. Affirmed. The facts are stated in the opinion.

*James T. Keena* (*Atkinson, Carpenter & Brooke,* of counsel), for appellant.

*Westerman & Westerman* and *Seth Bean* (*Levi T. Griffin,* of counsel), for plaintiff.

[The points and authorities of counsel are so fully reviewed in the opinion that their restatement is omitted.—REPORTER.]

LONG, J. Plaintiff brought her action upon a policy of insurance, the material parts relating to this case reading as follows:

"In consideration of the representations made in the application for this insurance, and of the sum of twenty-five dollars, this company hereby insures Daniel L. Blackstone, Esq., residing at Adrian, county of Lenawee, and State of Michigan, hereinafter styled the insured, by occupation, profession, or employment a traveling salesman, * * * in the principal sum of five thousand dollars for the term of twelve months, commencing at 12 o'clock noon on February 27, 1886, the said sum to be paid to Mrs. Emma W. Blackstone, his wife, if surviving, * * * within thirty days after the receipt of satisfactory proofs that the said insured shall have sustained during the continuance of this policy bodily injuries, effected through external, violent, and accidental means, within the intent and meaning of this contract and the conditions hereunto annexed, and such injuries alone shall have occasioned death within ninety days from the happening thereof: * * * * * * * * *

"*Provided, always,* that this policy is issued and accepted subject to all the provisions and conditions herein contained and referred to. The statements and declarations of the insured, in his application for this insurance, together with the company's classification of hazard, is referred to and made a part of this contract; and that if this policy, or any renewal thereof, has been made or shall be obtained through misrepresentation, fraud, or concealment, or if any attempt shall be made by false swearing or suppression of any material fact on the part of the insured or beneficiary, to obtain any sum under this policy or any renewal thereof, then the same shall be absolutely void.

"*Prvvided, always,* that this insurance shall not extend to hernia; nor to any bodily injury of which there shall be no external or visible sign; nor to any bodily injury happening directly or indirectly in consequence of bodily infirmities or disease, or by poison in any manner or form, or by any surgical operation or medical or mechanical treatment; nor to any case except where the injury is the proximate and sole cause of the disability or death. And no claim shall be made under this policy when the death or injury may have been caused by dueling, fighting, wrestling, unnecessary lifting, or by overexertion, *or by suicide,* or by sunstroke, freezing, or intentional injuries inflicted by or through the connivance of the insured, or when the death or injury may have happened in consequence of war. * * * And this insurance shall not be held to extend to disappearances, nor to any case of death or disability unless the claimant under this policy shall establish by direct and positive proof that the said death or disability was caused by external violence and accidental means."

This policy was made subject to certain conditions, the second of which is:

"The insured is required to use due diligence for personal safety and protection. In the event of any accidental injury for which claim may be made under this policy, immediate notice shall be given in writing, addressed to the company at Detroit, Michigan, stating the full name, occupation, and address of the insured, with full particulars of the accident and injury; and fail-

ure to give such immediate notice shall invalidate all claims under this policy; and unless direct and affirmative proof of the death of the insured shall be furnished to the company within ninety days from the happening of such fatal accident, or within six months in the case of non-fatal injury, then all claims accruing under this policy shall be waived, and forfeited to the company."

The policy was issued upon a written application signed by the insured. The twelfth, thirteenth, and fourteenth clauses of the application are as follows:

"12. My habits of life are correct and temperate, and I understand the policy will not cover any accident or injury resulting from the use of intoxicating drinks, or in consequence of having been under the influence thereof, or a breach of the law, or to any injury which may result from disease or prior injury. I am aware and agree that the benefits from the company will not extend to hernia, orchites, overexertion, or strains, nor to any bodily injury which has not been effected through external and accidental violence, or of which there shall be no external and visible sign, or by poison in any form or manner, or by any surgical operation or medical or mechanical treatment, nor to any cause except where the accidental injury shall be the proximate and sole cause of the disability or death.

"13. I am not suffering from any accident or wounds that would retard recovery, or be aggravated by personal injury. I am not subject to fits, or to any disorders of the brain or nervous system, or any physical infirmity which would render me liable to accident.

"14. I hereby agree that this application and declaration shall be the basis of the contract; that the policy will be accepted subject to all the conditions and provisions contained therein; that any concealment of material facts, or misstatements made by me, shall work a forfeiture of all claims that may accrue under this policy."

The declaration filed in the case, after stating the issuing and the conditions of the policy, avers—

"That on October 28, A. D. 1886, her said husband died from bodily injuries, effected through external, violent, and accidental means, within the intent and mean-

ing of the said policy contract, and the conditions therein set forth; and that said injuries alone occasioned his death, and within ninety days from the happening of said injuries."

The defendant pleaded the general issue, and gave notice that the policy declared upon was obtained by the insured upon an application,—the material portions of which have been heretofore set out,—and under an agreement that said application should be the basis of the contract; that, at the time when said application was made, the insured was subject to disorders of the brain and nervous system, and to physical infirmities which rendered him liable to accident, and the fact that he was so subject was concealed by him from the defendant; that the insured died from injuries resulting from disease; that the insured, before the time he made said application, had been for a long period insane, and at the time of making said application concealed that fact from the defendant.

On the trial in the court below the plaintiff had verdict and judgment for the amount of the policy and interest.   Defendant brings error.

It appeared upon the trial in the court below that the insured, Daniel L. Blackstone, was a traveling salesman, and was employed in that capacity during the spring and summer of 1886 by the Acme Hay Harvester Company, of Peoria, Ill.   About September 1, 1886, he was thrown out of employment, and returned to his home in Adrian, and remained there until October 18, when by correspondence he secured a situation with the Mast, Buford & Burwell Manufacturing Company, of St. Paul, Minn. He left his home in Adrian October 18, for the purpose of filling this engagement, and arrived in St. Paul on the 19th, and remained there until the 27th of that month, when he put an end to his life by cutting his throat with

a razor. It is claimed by plaintiff that during the last two or three weeks of his remaining at home he showed evidence of mental derangement, and that during his stay in St. Paul, from October 19 to 27, there was evidence of insanity. The plaintiff's claim of recovery on the policy rests upon two propositions, each of which is denied by the defendant:

1. That Blackstone was insane at the time he took his life.
2. That an insane self-killing is an accident within the meaning of this policy.

Was Blackstone insane at the time he took his life? At the close of the testimony the counsel submitted five special questions to the jury for their finding, as follows:

1. Did Mr. Blackstone kill himself?
2. Did he know at the time that he was committing an act which must result in death?
3. Was he conscious of what he was doing?
4. Did he intend to cut his throat, and thereby kill himself?
5. At the time Daniel L. Blackstone cut his throat, was he insane?

The jury answered these questions, the first and fifth in the affirmative, and the second, third, and fourth in the negative. We have, therefore, presented to us, by the record of the fifth finding of the jury, that the insured was insane at the time he cut his throat, and the only inquiry for us upon this part of the case is: Was there any evidence to support this finding?

It was said by this Court in *Conely v. McDonald*, 40 Mich. 158:

"We are bound in all cases to assume that the jury have done no legal wrong when acting within their province. * * * The credibility of witnesses, the strength of their testimony, its tendency, and the proper weight to be given it, are matters peculiarly within their province. * * * To take from them this right is but usurping a power not given."

This doctrine has always been adhered to in this State, and has been stated and restated in so many cases in this Court that no reference to them is necessary.

The testimony relating to the insanity of Mr. Blackstone is somewhat voluminous, and we shall quote only portions of it.

Mr. Wallace Westerman was called as a witness by the plaintiff, and testified substantially that he had known Mr. Blackstone between 12 and 13 years; that he was a man of more than ordinary intelligence,—a man well read, courteous, and of more than ordinarily pleasant and genial disposition. His business for 10 years prior to his death was that of a traveling salesman engaged with different houses. For four or five years he was with Comstock Bros., of Adrian; then for Fairbanks, Morse & Co., up to April, 1886; and then for the Acme Hay Harvester Company of Peoria, up to September 1, 1886, when he returned home. His family relations were of the most pleasant character. He had a wife, and a family consisting of two girls and one boy. From the time of his return home—the 1st of September—till his going away on October 18, 1886, witness was in his house every day. At the first of his being home at this time, he saw no special difference in his conduct, but after he had been home two or three weeks he discovered a marked change in his conduct. These characteristics came on by degrees. He appeared to be depressed; and, the nearer the time came for him to leave home, this despondent, indifferent sort of disposition seemed to grow upon him. He complained that he did not sleep well, and put his hand up to his head; frequently found him walking the floor, and sometimes sitting in a chair in a sort of stupid condition, paying no special attention to those around him; complained of pain in the head, and his face had a bloated appearance. He fell away in flesh, and appeared to be

haggard, and, as these spells would pass off, would look pale and sickly. The witness, upon a direct question, said:

"I was of the opinion that the man was insane. I did not object to his going, because I did not think the man's mind was so far gone but that when he got away from home he would recover from it; that if he could get away from home he would brace up and recover from it. The deceased was my father-in-law."

Mrs. Westerman, the wife of the last witness, and a daughter of the deceased, testified that her father's domestic relations were pleasant; that she saw him every day for the three weeks before his going to St. Paul, and noticed a marked change in his condition. He complained of his head and stomach. He did not take much notice of his grandchildren, when before that he always loved to have them around him; but at that time their noise seemed to worry him. He would not go out at all, and did not seem to want to see any one.

Mr. Henry Armstrong, a resident of Adrian, saw the deceased frequently, and noticed a change in him just before his going away, as he passed him on the street. The change was so great that he hardly recognized him.

Walter Westerman testified that he had known him for years; that he was always in the habit of shaking hands with every one, and made many friends; was pleasant, social, and agreeable in his manners; a man who was very bright, of more than ordinary education, and always ready to make a speech wherever called upon. Witness is a partner with the witness Wallace Westerman, in the law business, and deceased was frequently in their office, but for the three weeks before deceased's going away in October he but seldom came to the office. Just prior to his going away to St. Paul he came in the office, and came up within a few feet of Westerman, who got up and

offered to shake hands, but Blackstone apparently did not see him make the offer, and did not shake hands, but stood with his head down, and finally said, "Where is Wallace? Tell him I want that key;" and, turning around, went partly to the door, turned again into the room a few feet, and finally went, slamming the door after him.

The plaintiff says that before his going away on October 18 she noticed a change in his mental condition. He was uneasy and nervous, complained of his head, and had a desire to be alone. He appeared bad, his face was flushed and bloated, he did not sleep much, manifested restlessness by walking in the house and out in the back yard; went down town but little.

"We could divert his mind so that he would be social for a few minutes, but just as soon as we stopped talking with him his mind was absorbed in something. We did not know what he was thinking about. He was affected in his mind. We let him go away because we thought with employment, and being out of doors, he would be better."

Depositions were taken at St. Paul, and read on the trial. J. Summers testified he kept the Windsor Hotel, and that Blackstone stopped there from October 20 to the 28th; that on that day one of the servants informed him that a man upstairs had cut his throat. He went upstairs, found Blackstone in his room, lying on the floor, between the wash-stand and the foot of the bed, in a crouched-up position. He was quite rigid. His throat was cut from ear to ear, apparently by the razor that was lying where he had fallen, covered with blood. Across the room, on a little bureau, lay an open satchel and the razor case. He had apparently been dead several hours. On the day previous to his death he was in the office the most of the afternoon. Never saw him in conversation with others about the hotel.

Mr. J. B. Baker, of St. Paul, testified that his business was that of keeping a restaurant. He met Blackstone a few days previous to his death. He was in very poor health, complained of his health, and said he was under treatment from Dr. McCoy for stomach troubles. He looked pale and haggard, restless, and in a very unpleasant state of mind. He would sit down for a minute, and then would get up and walk around, and talk about his trouble, his ill health, and he appeared to be slightly confused.

J. P. Warner testified that he was connected with Mast, Buford & Burwell, of St. Paul.

"On October 20, 1886, he was employed by our firm. He was to prepare himself a few days before starting out on the road. He was to start out Wednesday morning the week after. He came, and had his satchel all packed, and left the office about 5 o'clock Tuesday afternoon. He was to take the 8 o'clock train Wednesday morning. His valise was left at our office, and I was in doubt what had become of the man. On Thursday afternoon I learned he had killed himself.  *  *  *  *  *

"Q. Now, during the times you saw him, did you in your conversation with him detect in it any peculiarities of mental condition as evidenced by what he said or did?

"A. Yes. The second morning he was with us he came in in a hurried and peculiar manner, and rushed up to the counter to me, inquiring for mail in a very impatient manner, so much so that I was about to say something to him, and looked at him pretty sharp.  *  *  *  The duties he was to perform on the road required some study and posting. He would be getting information about one particular thing, and would turn off another minute, and be in some other place in the office looking at some book, and a few minutes afterwards would be out of doors, and at one time he went off on the railroad track when Mr. Burwell was not down, standing around at the Manitoba depot. He did not pay close attention to his duties. He acted strange in that he would not take time to listen as a person ought. He would shoot off when being talked to. He acted as if

he wasn't listening, and had that indifferent way. * * * I am satisfied from his peculiar actions that I saw, and his subsequent actions, that he wasn't in his right mind; and, outside of the fact that he committed suicide, I would say I would consider him unbalanced in his mind."

Mr. J. M. Bigford testified that he was a salesman for Mast, Buford & Burwell at St. Paul; that he met Mr. Blackstone first in October, at their office. It was his duty to post him on the classes of goods of which he was to make sales. He spent a part of each day with him. One day, while showing him a new model plow, it was almost impossible to get him interested in it. He asked no questions, and did not seem to put his mind to it, and did not give the least indication that he understood it. He seemed to be in a deep study, and his mind wandering off from the subject being talked about. He asked to be excused ; said he wanted to go upstairs ; did not go, but went into the office, and took off his overcoat, and paid no more attention to the business.

"I remarked [said the witness] to Mr. Warner that I didn't think he was right. I was of the opinion that he was not in his right mind. What I told him seemed to make no impression on his mind. I would go over the same ground again, and still he appeared as ignorant as he did before. I believed him to be a man of unsound mind."

Mr. H. A. Estes was clerk of the Windsor Hotel, and noticed that the deceased did not take his meals regularly, appeared to be despondent, and made no acquaintances about the house. He complained of not feeling well.

Dr. James A. Quinn testified that he was a physician at St. Paul, and saw the deceased after his death; made an examination, and says that the wound in the throat was the cause of death, and was one which could have been made by the deceased with his own hand.

This is substantially all the testimony bearing on the

question of the insanity of the insured, except some circumstances related by Mr. Wallace Westerman and Walter Westerman relating to some peculiarities in the conduct and bearing of the insured just prior to his going to St. Paul.

Mr. Blackstone wrote home to his wife from St. Paul on the 19th, and again on the 20th and 23d, and in his last letter acknowledged receipt of letters from home. These letters are concise, speaking of his business arrangements, and making inquiry about the health of the family. In the letter of the 20th he speaks of the pain in his head and stomach, and says he thinks it was the jar of the cars, and hopes it will not affect him so badly when he comes to travel again. In this letter he also speaks of seeing in the papers an account of a number of persons in Adrian being poisoned by drinking cider in which arsenic was put, and inquired of his wife who they were. In the letter of the 23d he says:

"I am tired out. I am very sorry to pain you by writing this, but you asked me to tell you how I felt. It seems to me if I could have some work out of doors, like riding, and something to employ my mind, I might gain. I shall do the very best I can in this direction. Pray for me, and do not blame me for what may seem inconsistent to you."

We think there was some evidence to go to the jury upon the question of insanity. It is not of great weight, but that is not a question which we are at liberty to discuss; and while we might have found differently from the jury if we were to consider it as a question of fact for our determination, yet, there being some evidence of the fact, and the jury having determined it under what we think a fair submission of it by the court to them, we are not called upon to disturb it.

The insured was a man 55 years of age, of genial and pleasant disposition, full of life and vigor up to within

a few weeks of his death; a man of good education, and good mind; talkative, and apparently happy. His domestic relations were pleasant, and, so far as this record discloses, no great amount of care was placed upon him in their support and maintenance. One of the daughters was married to a man apparently prosperous in business, and the insured had no debts of any amount, and no creditors pressing him for payment. Up to within a month or six weeks of his going to St. Paul he had been constantly employed at good wages, and no one dependent upon him was suffering during that time from his enforced idleness. He became moody, restless, and nervous before leaving home. He could not sleep nights, walked the floor, and was found at times pacing the back yard. His condition became noticeable to his wife and the family. He was abstracted, and at times failed to respond to the salutations of his acquaintances. His mind seemed to be troubled; complained of pain in the head, and looked haggard and sick. On his arrival at St. Paul, where he was among strangers, his appearance caused remarks. He could not get to the business he went to take charge of,—could not keep his mind upon it; was nervous and restless, wandering from place to place, and changeful in his conduct; nervous, and keeping aloof from other men by whom he was surrounded; complained of pain in his head and stomach; wrote home to his wife to pray for him, and not to blame him if he did anything inconsistent; and finally, on the 28th of the month, he is found with his throat cut from ear to ear by a razor, the act being committed by his own hand.

Every person is presumed sane, and the burden is upon the plaintiff in the case to show the insured insane at the time of the taking of his life. The jury must determine this question from the acts and conduct of the

deceased, and this can only be gathered from witnesses who are cognizant of the facts.

The learned counsel for the defendant, however, argues that, even if there was evidence to go to the jury on the question of insanity, and though the jury have found that the insured came .to his death while insane, yet, it appearing that he came to his death by his own hand, it is not a bodily injury, effected through external, violent, and accidental means, within the meaning of the policy.

. Practically, all the cases agree in holding in the language of the supreme court of Massachusetts in *Cooper v. Ins. Co.*, 102 Mass. 227, that there is no substantial difference of signification between the phrases, "shall die by his own hand," "shall commit suicide," and "shall die by suicide." The rule of construction, though not always recognized by the cases, is that this condition, being in the nature of a penalty or forfeiture, must be strictly construed. In *John Hancock, etc., Ins. Co. v. Moore*, 34 Mich. 45, Mr. Justice CAMPBELL, speaking for the Court, said:

"The condition which makes the policy void in case of such a death is in the nature of a penalty or forfeiture. * * * The forfeiture in this case was to arise if the insured died by his own hand. Some stress is laid on the term 'suicide,' as if it means a wrongful act, or self-murder. It has no such restricted meaning. It means self-killing, just as 'homicide' means killing any one else. But there may be excusable homicide as well as felonious; and suicide was only cognizable at law when the person was *felo de se*, or guilty of a felonious act. If *non compos mentis*, the actor in homicide or suicide commits no crime. In one sense the man dies by his own hands who kills himself, whether sound or frenzied. But the condition in this policy cannot be construed to cause a forfeiture for acts involving no evil will."

Upon the question of voluntary suicide, intentionally committed by a sane man in the possession of his facul-

ties, knowing how to adapt means to ends, and conscious of the immorality of the act, there is no difference of opinion; and all authorities agree that such self-destruction is within the exemption; and all authorities likewise agree that an accidental death,—as by taking poison by mistake, or shooting one's self with a pistol, supposing it not to be loaded, or falling from a building, or death happening in any way by the unintended act of the party dying,—is not within the exemption. But whether suicide by an insane man is also within the exemption has been the question in dispute, and upon this two prominent and different doctrines have been maintained. On the one hand it is maintained that if the act be voluntarily done in pursuance of an intelligent purpose, and intentionally and intelligently carried out by the proper adaptation of means to ends, it is suicide on the part of the insured, or death by his own hands, although insanity exists to such an extent that he may not be able to appreciate the moral qualities of the act. On the other hand it is maintained that, however intelligently the act may be done, if at the time the will be overpowered by an uncontrollable impulse, or the party be unable to appreciate the moral character of the act, it is not within the meaning of the provision. May, Ins. § 307.

The rule in England was laid down in 1843, in *Borradaile v. Hunter*, 5 Man. & G. 639, and has since been adhered to. In this case the words of the condition were that the policy should be void if the insured should "die by his own hands." He threw himself from Vauxhall bridge into the Thames, and was drowned. The jury found that he voluntarily threw himself into the river, knowing at the time that he should thereby destroy his life, and intending thereby to do so; but at the time of committing the act he was not capable of judging between right and wrong. It was held that the policy was void,

the rule being laid down, in effect, that the moral condition of the mind was immaterial; and if, when the act was done, the insured knew that life would be thereby destroyed, and intended it to be so, the policy is violated under the condition, although the insured was insane at the time.

In *Dean v. Ins. Co.*, 4 Allen, 96, the supreme court of Massachusetts held substantially the doctrine as laid down in *Borradaile v. Hunter, supra.*

In *Ins. Co. v. Graves*, 6 Bush, 268, the supreme court of Kentucky were divided upon the question of the soundness of *Borradaile v. Hunter*, but unanimously agreed that where the suicide was committed during an uncontrollable passion, caused by intoxication, the condition was broken, and the policy avoided.

In a more recent case in Massachusetts (*Cooper v. Ins. Co.*, 102 Mass. 127) the question came again before the court, and the ruling in *Dean v. Ins. Co., supra,* was adhered to. The proviso in the policy is that it shall be void if the insured shall die by suicide. The plaintiff offered to prove that the insured at the time of committing the act of self-destruction was insane. The court said:

"In the present case there was no offer to prove madness of delirium, or that the act of self-destruction was not the result of the will and intention of the party adapting the means to the end, and contemplating the physical nature and effects of the act."

The earliest case in New York is that of *Breasted v. Trust Co.*, 4 Hill, 73. The policy was to become void if the insured died by his own hand. The insured came to his death by suicide by drowning himself in the Hudson river. Chief Justice Nelson, delivering the opinion of the court, said, speaking legally:

"Self-destruction by a fellow-being bereft of reason can

with no more propriety be ascribed to the act of his own hand, than to the deadly instrument that may have been used for the purpose. The drowning of Comfort was no more his act, in the sense of the law, than if he had been impelled by irresistible physical power; nor is there any greater reason for exempting the company from the risk assumed in the policy than if his death had been occasioned by such means. ` * * * Suicide involves the deliberate termination of one's existence while in the possession and enjoyment of his mental faculties. Self-slaughter by an insane man or a lunatic is not an act of suicide, within the meaning of the law;" citing 4 Bl. Comm. 189; 1 Hale, P. C. 411, 412.

This case was modified, if not overruled, in *Van Zandt v. Ins. Co.*, 55 N. Y. 169, where it was held that, under a condition as above, the only exception to the condition is where the act is accidental or involuntary; that to take a case out of the proviso the insured must have been so mentally disordered as not to understand that the act he committed would cause his death, or he must have committed it under the influence of some insane impulse, which he could not resist. It is not sufficient that his mind was so impaired that he was not conscious of the moral obliquity of the act. In the later cases in New York it is held that the words "die by his own hand" have reference to an intelligent voluntary act, and not to a suicide committed by a party in a state of mental derangement so great that the act of self-destruction is to be regarded as wholly involuntary. *DeGogorza v. Ins. Co.*, 65 N. Y. 235; *Weed v. Ins. Co.*, 70 Id. 561; *Newton v. Ins. Co.*, 76 Id. 426.

The supreme court of Maine, in *Eastabrook v. Ins. Co.*, 54 Me. 224, where the condition of the policy was that if he should "die by his own hand," and the jury found "that the self-destruction was the result of a blind and irresistible impulse over which the will had no control," and that "the self-destruction was not an act of voli-

tion," approved *Breasted v. Trust Co., supra,* holding that suicide, to avoid a policy of life insurance, must be a criminal act,—one done with an evil motive.

The leading case upon the subject is that of *Ins. Co. v. Terry,* 15 Wall. 580, approving what had been known as "New York doctrine." In this case the policy was to be void if the insured should die by his own hand. Mr. Justice Hunt, after a full review of the cases, laid down the rule thus:

"If the assured, being in the possession of his ordinary reasoning faculties, from anger, pride, jealousy, or a desire to escape from the ills of life, intentionally takes his own life, the proviso attaches, and there can be no recovery

"If the death is caused by the voluntary act of the assured, he knowing and intending that his death shall be the result of his act, but when his reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, consequences, and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse, which he has not the power to resist, such death is not within the contemplation of the parties to the contract, and the insurer is liable."

This rule has been approved by subsequent cases in that court. *Ins. Co. v. Rodel,* 95 U. S. 237; *Ins. Co. v. Broughton,* 109 Id. 121 (3 Sup. Ct. Rep. 99); citing and approving the opinion of Chief Justice Nelson in *Breasted v. Trust Co., supra.* The rule laid down in *Ins. Co. v. Terry,* 15 Wall. 580, is substantially the same doctrine as stated by this Court in *Ins. Co. v. Moore, supra.*

We think the reasonable rule is as stated by Mr. Justice Hunt in *Ins. Co. v. Terry, supra,* which is approved and followed in express terms, or in substance, in *Ins. Co. v. Rodel,* 95 U. S. 232; *Ins. Co. v. Broughton,* 109 Id. 121; *Waters v. Ins. Co.,* 2 Fed. Rep. 892; *Moore v. Ins. Co.,* 3 Ins. Law J. 444 (U. S. C. C. E. D. Michigan); *Mer-*

*ritt v. Ins. Co.*, 55 Ga. 103; *Phillips v. Ins. Co.*, 26 La. Ann. 404; *John Hancock, etc., Ins. Co. v. Moore*, 34 Mich. 41; *Scheffer v. Ins. Co.*, 25 Minn. 534; *Ins. Co. v. Groom*, 86 Penn. St. 92; *Hathaway's Adm'r v. Ins. Co.*, 48 Vt. 335. The same doctrine, in substance, is laid down in *Eastabrook v. Ins. Co.*, 54 Me. 224, approving the principal cases.

The effect of this doctrine is that, in order to work a forfeiture under such a policy on the ground of self-destruction, the insured must have had sufficient mental capacity not only to understand that the act will destroy his life, but also to distinguish its moral quality and consequences,—the right and wrong of it,—and must perform the act, not under any uncontrolled impulse resulting from insanity, but voluntarily, with the intent to end his life; in other words, that it must be an act done with an evil motive. We think that this doctrine is supported by the great preponderance of authority in this country, and must be conceded to be the prevailing American doctrine; and it seems to us to be the safer and more reasonable and more consistent doctrine. It agrees with the general rule as to the excusatory feature of insanity in civil as well as in criminal cases. It also operates to prevent forfeiture, which is a favorite principle of an enlightened jurisprudence. Nor can it have any injurious effect, since insurers may always frame such contracts to suit themselves, and may, if they choose, insert express stipulations to the effect that insanity shall not in any case prevent an avoidance by the suicide of the insured. As is stated in a note to *Breasted v. Trust Co.*, 59 Amer. Dec. 494:

" If they prefer, for the purpose of getting custom, to omit such stipulations, and to leave the matter in doubt, the doubt ought to be resolved against them. If the

assured is to take the sole risk of his becoming insane, and destroying his life, let him have notice of the fact by having it clearly 'nominated in the bond.' As has been well said in some of the cases referred to, insanity is as much a disease as fever or consumption; and upon principle there is no more reason why an insurance of one's life should not be an insurance against death from the former disease than against death from the latter, if there is nothing to the contrary in the policy."

Policies issued by some life insurance companies contain a condition or provision that it shall be void if the insured shall die by suicide, felonious or otherwise, sane or insane; others provide, if the insured shall die by suicide, sane or insane; others provide for an avoidance, if the insured die by his own hand, sane or insane; while others provide for an avoidance if he shall die by his own act and intention, sane or insane. Such a condition, expressed in any of these forms, covers any case of voluntary self-destruction, and no kind or degree of insanity will prevent an avoidance; and the courts, not only in England, but in this country, have almost universally held that with such provisions in policies of life insurance the policies are void if the insured comes to his death by his own hand. Some of those cases are cited by the learned counsel for the defendant in their brief as having some bearing upon the question now in issue. We think they have no bearing upon the case where no such proviso is found in the policy.

Defendant's counsel seem to rely to some extent upon the ruling of this Court in *Streeter v. Society*, 65 Mich. 202, as bearing upon the question whether the insured came to his death in this case by accidental injuries. The policy in that case contained a condition,—

"If the insured shall, * * * within three years of the date of this policy, die by his own hand, sane or insane, * * * this policy shall become and be null and void."

Within three years from the date of the policy the insured died from the effects of a pistol-shot wound inflicted upon himself.    This Court followed the opinion of Mr. Justice Davis in *Bigelow v. Ins. Co.*, 93 U. S. 284, holding that no recovery could be had upon the policy, by reason of the limitation contained in the proviso, "sane or insane." After quoting from the opinion of Mr. Justice Davis, it was said:

"If a person does an act in a state of unconsciousness, or involuntarily, whether he be sane or insane, such act is nothing more nor less than accidental, and would not operate to forfeit the policy.    The record in this case does not disclose such a state of facts.    There was no evidence that the act was involuntary, or that Mower was unconscious when he inflicted upon himself the fatal wound.    *    *    *    The policy covers all conscious acts of the insured by which death by his own hand is compassed, whether he was at the time sane or insane. If the act was done for the purpose of self-destruction, it matters not that the insured had no conception of the wrong involved in its commission."

Counsel for the defendant now insist that, if the insured was insane, his insanity caused his death, and that insanity is a disease, and that the question remaining, and upon which this Court must pass, is: Is death caused by the disease "insanity" an accidental death? The policy provides—

"That this insurance shall not extend    *    *    to any bodily injury of which there shall be no external or visible sign, nor to any bodily injury happening directly or indirectly in consequence of bodily infirmities or disease, *    *    *    nor to any case except where the injury is the proximate and sole cause of the disability or death."

Is insanity a disease?    The learned Dr. Buckham, in his work on Insanity in its Medico-Legal Relations, published in 1883, at section 23, says:

"We think sufficient evidence has already been educed to show that insanity is a physical, and not a mental,

disease. And yet the proof *par excellence* remains to be offered. We have taken considerable trouble to acquaint ourselves with the facts, and we believe that there is no alienist in the United States who believes that insanity is a disease of the mind."

And the learned doctor offers the following as a definition of insanity:

" A diseased or disordered condition or malformation of the physical organs, through which the mind receives impressions, or manifests its operations, by which the will and judgment are impaired, and the conduct rendered irrational."

And he says:

" As a corollary we offer: Insanity being the result of physical disease, it is a matter of fact to be determined by medical experts, and not a matter of law to be decided by legal decisions and maxims."

Agreeing, as we do, with the learned doctor, that insanity is a physical disease, and a question of fact for determination in the case, let us see what has been determined by the jury, before considering the proposition made by the counsel for the defendant.

The jury found—

1. That the insured killed himself.
2. That he did not know at the time that he was committing an act which must result in death.
3. That he was not conscious of what he was doing.
4. That he did not intend to cut his throat, and thereby kill himself.
5. That at the time he did cut his throat he was insane.

Admitting that there was some evidence to go to the jury upon those questions, and that those questions have been properly submitted to them by the court upon the trial, then we are asked to say that, insanity being a disease, that disease was the proximate cause of the death of the insured, and that he did not come to his death by

an external accidental injury, within the meaning of the terms of the policy. In *Ins. Co. v. Crandal*, 120 U. S. 527 (7 Sup. Ct. Rep. 685), a policy similar in form and conditions was issued, based upon an application in substance the same as the one in issue here. Mr. Justice Gray, delivering the opinion of the Court in that case, said:

"The single question to be decided, therefore, is whether a policy of insurance against 'bodily injuries effected through external, accidental, and violent means,' and occasioning death, or complete disability to do business, and providing that 'this insurance shall not extend to death or disability which may have been caused wholly or in part by bodily infirmities or disease, or by suicide or self-inflicted injuries,' covers a death by hanging one's self while insane. The decisions upon the effect of a policy of life insurance which provides that it shall be void if the assured 'shall die by suicide,' or 'shall die by his own hand,' go far towards determining this question. This Court, on full consideration of the conflicting authorities upon that subject, has repeatedly and uniformly held that such a provision, not containing the words 'sane or insane,' does not include a self-killing by an insane person, whether his unsoundness of mind is such as to prevent him from understanding the physical nature and consequences of his act or only such as to prevent him, while foreseeing and premeditating its physical consequences, from understanding its moral nature and aspect;" citing *Ins. Co. v. Terry*, 15 Wall. 580, and other cases in that Court since that time. "In this state of the law there can be no doubt," says Justice Gray, "that the assured did not die 'by suicide,' within the meaning of this policy; and the same reasons are conclusive against holding that he died by 'self-inflicted injuries.' If 'self-killing,' 'suicide,' 'dying by his own hand,' cannot be predicated of an insane person, no more can 'self-inflicted injuries,' for in either case it is not his act. Nor does the case come within the clause which provides that the insurance shall not extend to 'death or disability which may have been caused wholly or in part by bodily infirmities or disease.' If insanity could be considered as coming within this clause, it would be doubtful, to say the

least, whether under the rule of the law of insurance which attributes an injury or loss to its proximate cause only, and in view of the decisions in similar cases, the insanity of the assured, or anything but the act of hanging himself, could be held to be the cause of his death. * * * The death of the assured not having been the effect of any cause specified in the proviso of the policy, and not coming within any warranty in the application, the question recurs whether it is within the general words of the leading sentence of the policy, by which he is declared to be insured 'against bodily injuries effected through external, accidental, and violent means.' This sentence does not, like the proviso, speak of what the injury is 'caused by,' but it looks only to the 'means' by which it is effected. No one doubts that hanging is a violent means of death, as it affects the body from without. It is external, just as suffocation by drowning was held to be in the cases of Trew, Reynolds, and Winspear, above cited. And according to the decisions as to suicide under policies of life insurance before referred to, it cannot, when done by an insane person, be held to be other than accidental."

Counsel for defendant, considering this case of *Ins. Co. v. Crandal*, says,—

"That while the Court held that insane self-destruction was an accidental death, and seemed to be of the opinion that insanity was a disease, there was no discussion by the Court of the question whether insanity, being a disease, would not preclude insane self-destruction being an accidental death; that the Court avoided the discussion of this question by suggesting, though they did not decide, that, in accordance with the authorities already discussed, insanity was not the proximate cause of the death, and by deciding that the policy did not exempt the insurer from liability for a death of that character; that this was an evasion of the question squarely presented to the Court for consideration; that, regardless of the exceptions in the policy, the company was clearly not liable unless the death was accidental; and in deciding the case the Court was bound to say either that death was not caused by the disease *insanity,* or that death so caused is accidental death."

We think that the Court in that case held that, while insanity was a disease, yet the insured, having come to his death by hanging, though by his own hands, met with an accidental death within the terms of the policy.

Counsel for defendant asks, What does "external" mean? Can it be given any construction that will make it apply to violence done by the insured himself? Does it refer merely to the instrument of death? And he says:

"I submit that external violence is that coming from sources outside of the insured; that Blackstone's death came about through internal means; that it was caused by his own hand in a literal, if not in a legal, sense; that his hand moved in obedience to his will, however darkened his will may be; that it was not involuntary; that he was not trying to do something else; therefore the injury was not external or accidental."

We do not agree with counsel in this proposition. We think the insured came to his death by violent, external, accidental injuries, within the meaning of this policy. Without going over the reasons brought to bear upon the questions, it is evident that the words "death by suicide," "death by his own hand," and other words of similar import, are held to be made applicable only to that class of cases where the insured comes to his death by his own voluntary act. These questions have been settled by the jury: That the deceased was insane; that he took his own life; that he did not intend in cutting his throat to kill himself; and that he was not conscious that his death would be occasioned thereby.

Let us suppose, as an illustration, that A. and B. take a policy of like terms and conditions as the one in suit, based upon similar applications, with all the conditions and provisions contained in the present case, and during the life-time of each of those policies, A. becomes insane, and, while so insane, with a pistol shoots and kills B.,

and in the same moment turns the pistol and kills himself. No one would question but that by the terms and conditions of B.'s policy he had met with an accidental, external, and violent death, and the company would be held liable; that the case came within the provisions of the policy. Yet counsel for the defendant contend that, conceding that B. came to his death by accidental, external, and violent injuries, because inflicted by the hand of another, yet if A., although insane, and wholly unconscious of the act of killing, not by force of his own will, but because he was bereft of reason, kills himself, it is not an external injury and accidental death, within the meaning of the policy. We think in a case of that kind A.'s death was as much an external, violent, accidental death as was the death of B. A. is no more responsible for the act than was B. It was involuntary; it was not the act of his own will; it was not his death by his own hand, in legal contemplation, but he came to his death at the hand of a madman, though that madman was himself. We think that the defendant, under the finding of the jury in this case, cannot be now heard to say that this was not an accidental death, and an external injury, coming within the terms of the policy.

We find cases in which it is held under like policies, where one becoming insane falls down upon a railroad track and is thereby killed by the passing of a train, that such cases come within the provisions of the policy, and the company would be liable. It is also held, where one, being insane, through his insanity has placed himself in a dangerous position, where he would not have been found had he been in his right mind, and has met with an accidental death by reason of his insanity, that the company is liable, and recovery can be had; that where one in a fit of insanity involuntarily falls off a bridge and is killed, or falls into a stream and is drowned,

—this being involuntary,—the company is liable. Yet counsel say that this class of cases are external injuries, injuries producing death of the insured from outside causes, and for that reason the company may be held liable. We think where one is so far beside himself, his intellect so darkened and obscured, that he may be neither morally nor legally responsible for his own acts and conduct, and in such condition produces his own death, it cannot be any more said to be his act than though the act had been committed by another, or the insured had placed himself upon some dangerous height and had fallen involuntarily, and been dashed to pieces.

Some other questions are raised by the record, but we do not deem them of sufficient importance to discuss them here. We think the case was fairly submitted to the jury by the court, and fairly tried. The court, upon this question of sanity or insanity of the deceased, instructed the jury:

"But, as I have before stated, the mere fact that a man kills himself does not of itself establish insanity. A man may do that by reason, as I have said, of lacking courage to undertake the work which his life seems to furnish for him; may get discouraged, and believe he would rather take his chances in the life to come than here. And if under that sort of a determination he takes his own life, that would not be the taking of his life under a condition of mind which the law would say was insanity. If you believe Mr. Blackstone took his life under such conditions, then the plaintiff cannot recover; otherwise, if you believe, as I have charged you, * * * that he had no power to do it, and had no capacity of mind to do it, then the plaintiff would be entitled to recover, because, as I have instructed you, death under such circumstances would be accidental."

Some question is raised now by the defendant that there was proof of the insanity of the deceased some 20 years before the time of the taking out of the present policy. Some evidence was given of this upon the trial.

Defendant's counsel insist that this was a concealment of a fact from the insurance company at the time of the application in the present case. This objection was overruled by the court below, and we think very properly, under the testimony of the defendant's own agent, Mr. H. E. Rich, who took the application in the present case. He testified that he remembered taking the application; that he wrote the body of it. He says he had a previous talk with Mr. Blackstone coming across on the Jackson branch from Tecumseh to Adrian,—

"And we renewed our talk in regard to the accident insurance, and he thought he could not afford to take so much. I told him he could make it in two payments,—pay part in thirty days, and the balance in sixty days, for $5,000, and $25 weekly indemnity; and he thought he would be able to make the payments in that way, and said he would talk with his wife in regard to it, and see whether she thought he had better do so. He never had carried any, he said, but he would come in and see me before he left town. He came in afterwards, and said he had concluded to take a policy. I took out the application and filled it out. He said he would take the amount we talked of, and I asked him his full name and who the beneficiary would be, and he told me. I asked him if he had any other accident insurance, and he said, 'No;' and I drew a line through it, and turned to him,—he sat opposite my desk,—and told him to sign on the line, —sign his name in full, the same as I had written it in the heading. He did so, and I took the application and put it in my drawer."

On cross-examination the witness said:

"I didn't notice any difference in him than in any other man that I had ever solicited. He was as well informed as ordinary men I talked with on the same subject. The question was the amount in case of death and the amount of indemnity; that is all that was talked over. I should say he was an ordinarily informed man, not more than ordinarily well informed, as you meet them in soliciting insurance."

No evidence was given tending to prove that Black-

stone was not sane at the time of the taking of this policy, or that he had had any trouble mentally for a period of 20 years. The court, in its direction to the jury, excluded this whole question, and told the jury that it was claimed on the part of the plaintiff, who introduced the testimony, that it tended to establish the fact of his insanity at the time of committing the act; that it was claimed on the part of the defendant that it tended to establish that he was subject to mental disease, and that therefore, by the terms of the application, it was a false representation,—that Blackstone made a false representation in making the application, as regards that fact. But the court said:

" Gentlemen, for neither of these purposes, nor for any other purpose, nor for any other purpose whatever in the case, shall you consider this testimony."

And we think the court very properly excluded this from the consideration of the jury. We need not discuss the other questions raised.

The judgment of the court below must be affirmed, with costs.

SHERWOOD, C. J., CHAMPLIN and MORSE, JJ., concurred.

CAMPBELL, J. I have had great doubts whether there was enough evidence to go to the jury on the question whether when Mr. Blackstone killed himself he was *non compos mentis*. But I am disposed to concur in the view that there was some such testimony, and that therefore the jury could act on it. I also agree that suicide by a person *non compos* does not come within the forfeiture clause of the policy.

It has frequently been held by this Court that such unsoundness is a question of fact, and not of law. I do not, therefore, think it necessary to discuss the theories

on the subject, on which some confusion exists, arising more out of phraseology than from the essentials of the condition. I concur in the result.