MIRZA v MACCABEES LIFE AND ANNUITY COMPANY

Docket No. 117804. Submitted November 14, 1990, at Detroit. Decided
   January 22, 1991, at 9:10 A.M. Leave to appeal sought.

   Sajida Mirza and Manufacturers National Bank of Detroit, as
      trustees of the A. Malik Mirza Residuary Trust, brought an
      action in the Oakland Circuit Court against Maccabees Life and
      Annuity Company, seeking the proceeds of a policy insuring
      the life of A. Malik Mirza, M.D. The court, Barry L. Howard, J.,
      granted summary disposition for the defendant on the ground
      that the decedent's death was a suicide and the policy specifi-
      cally excluded payment of proceeds in the event the insured
      died by suicide while sane or insane within two years of
      issuance of the policy. The plaintiffs appealed, claiming that
      there existed questions of fact regarding whether a copy of the
      policy containing the suicide provision had been delivered to
      the decedent and whether the decedent had acted with suicidal
      intent in that he killed himself as a result of an irresistible
      impulse.

      The Court of Appeals *held:*

      1. Proof that the insured acted in response to an irresistible
      impulse in taking his own life does not negate suicidal intent.
      Because the plaintiffs failed to allege facts that negate suicidal
      intent, the trial court properly granted summary disposition on
      the basis of the policy provision barring payment in the event
      of suicide.

      2. The record fails to support the assertion that there is an
      unresolved question of fact with respect to the delivery of the
      policy to the decedent. The assertion in Mrs. Mirza's affidavit
      regarding an inability to find a copy of the policy among the
      decedent's records does not rebut the assertion in the affidavit
      of the insurance broker that the policy had been delivered to
      the decedent.

      Affirmed.

REFERENCES

Am Jur 2d, Insurance §§ 539, 541.
Insurance: construction of "sane or insane" provision of suicide
   exclusion. 9 ALR3d 1015.

INSURANCE — LIFE INSURANCE — SUICIDE — IRRESISTIBLE IMPULSE.
   Proof that an insured acted as a result of an irresistible impulse
   in committing an act of self-destruction does not negate suicidal
   intent so as to render inapplicable a provision in a life insur-
   ance policy precluding coverage where the insured dies by
   suicide while sane or insane.

*Alspector, Sosin, Mittenthal & Barson, P.C.* (by *Robert M. Sosin*), for the plaintiff.

*MacArthur, Cheatham & Acker, P.C.* (by *Paula M. Murray*), and *Mary T. Nemeth,* for the defendant.

Before: GRIFFIN, P.J., and SAWYER and BRENNAN, JJ.

GRIFFIN, P.J. This appeal involves a civil action in which plaintiffs, Sajida Mirza and Manufacturers National Bank of Detroit, trustees of the A. Malik Mirza Residuary Trust, sued defendant, Maccabees Life and Annuity Company, seeking to recover the proceeds of a life insurance policy covering decedent, A. Malik Mirza, M.D. Defendant moved for and obtained summary disposition on the ground that Mr. Mirza's death was a suicide, thereby precluding coverage pursuant to an applicable policy provision. Plaintiffs now appeal as of right, and we affirm.

I

On August 28, 1985, decedent applied for and obtained from defendant a policy of universal extraordinary life insurance. Defendant agreed to insure the life of decedent and to pay on his death to the beneficiary the sum of $800,000 if death occurred during the first year, and $250,000 if death occurred thereafter. The policy contained

the following general provision relative to death by suicide:

> If the insured dies by suicide while sane or insane, within two years from the Date of Issue, the Insurance Proceeds will not be paid.

In January 1987, decedent entered Oakwood Hospital in Dearborn, Michigan. According to the affidavit of his wife, plaintiff Sajida Mirza, decedent gave the following history and complaints:

> [F]or the previous several weeks, he had been feeling very depressed, had lost his appetite, had lost his interest in activities, had trouble falling asleep and staying asleep, had difficulty functioning at work, had lost interest in sexual activity, had experienced significant psychomotor retardation, felt helpless, hopeless, worthless and useless, had become despondent, had isolated himself and did not want to see anyone, had spoken of hurting himself and had actually attempted to choke me immediately prior to such hospitalization, was "thinking of ending it all," and had mentioned to me that there was "no future for us and that we should end it all" (earlier, he had threatened to poison his whole family and himself with carbon monoxide).

Decedent was discharged from Oakwood Hospital on January 26, 1987. According to Sajida Mirza, decedent continued treatment with his treating psychiatrist on an outpatient basis. Thereafter, on February 5, 1987, approximately one and a half years after the insurance policy became effective, decedent was discovered hanged in the bedroom of his West Bloomfield, Michigan, home. Decedent left no note or writing to explain his hanging.

On May 4, 1988, plaintiffs brought the instant

action to recover the $250,000 face amount of the insurance policy. Defendant interposed the suicide provision as a defense, and thereafter brought a motion for summary disposition pursuant to MCR 2.116(C)(10). Following a hearing on April 26, 1989, the trial court granted defendant's motion.

II

On appeal, plaintiffs make two principal arguments in support of their position that summary disposition was improper. As a preliminary matter, we must first dispose of plaintiffs' second contention. Although they did not argue the point at the hearing below, plaintiffs argue now that the affidavit of decedent's wife, Sajida Mirza, creates a factual question relative to whether the suicide provision was part of the insurance contract. In pertinent part, Mrs. Mirza's affidavit reads:

Following the death of my husband, I searched extensively through his personal records and effects that he kept in an orderly and complete fashion. Although I was able to locate certain other policies of insurance pertaining to my late husband, and even certain portions of the life insurance contract between my late husband and Maccabees Life and Annuity Company, I was unable to find any documents or writings from Maccabees which in any way excluded coverage for life insurance benefits from the death of my late husband, including but not limited to any documents or writings containing an exclusion for death by suicide. I have never seen or been aware of, either before or after my husband's death, any documents or writings from Maccabees which in any way excluded life insurance benefits upon the death of my late husband.

We find plaintiffs' contention in this regard to be

disingenuous and accordingly reject it. The gist of plaintiffs' position appears to be that Mrs. Mirza's affidavit supports the inference that defendant never provided decedent with the policy, its suicide provisions in particular, or an opportunity to reject and cancel the policy pursuant to MCL 500.4015; MSA 24.14015. However, in connection with its motion for summary disposition, defendant submitted the affidavit of its broker, Thomas Hogan, directly refuting any claim of nondelivery. Specifically, Hogan stated that he personally delivered the subject policy to decedent at 10:00 A.M. on December 6, 1985. He further averred that in 1986 decedent returned the policy to him to effectuate a change in ownership and that it was being held by Executive Benefits Plans Company pending that change.

With respect to a properly supported motion for summary disposition under MCR 2.116(C)(10), the party opposing the motion has the burden of showing, by affidavit or other documentary evidence, that there is a genuine issue for trial. MCR 2.116(G)(4); *Major v Auto Club Ins Ass'n,* 185 Mich App 437; 462 NW2d 771 (1990). Here, plaintiffs failed to meet this burden. The affidavit of Sajida Mirza to the effect that she could not find the policy among decedent's papers does not create a factual question regarding disclosure of the policy and its suicide provisions. The affidavit of Thomas Hogan on this point remains uncontroverted, and plaintiffs have failed to persuade us that a genuine issue of material fact exists.

III

We now turn to plaintiffs' principal argument on appeal. Plaintiffs contend that the trial court erred in entering summary disposition in favor of defen-

dant because, at the very least, a question of fact exists regarding whether decedent committed "suicide" within the meaning of the policy provision. Plaintiffs begin with the premise that the term "suicide" contemplates a volitional, intentional act of self-destruction. They then argue that decedent's hanging was not volitional because he suffered from an organic depressive condition which rendered him incapable of resisting the impulse to commit the act. In support of this proposition, plaintiffs rely on the affidavit of Dr. Tanay:

> Based upon available information I am of the opinion that the self-inflicted death of Dr. Mirza occurred in a state of mind which rendered him unable to exercise choice and deliberation. Dr. Mirza suffered from Depressive Disorder, which is a psychobiological condition not subject to willpower and which renders the person incapable of exercising reasonable choices. It is my opinion that the self-destructive behavior of Dr. Mirza on February 5, 1987, was a symptom of his illness over which he had no control. A number of psychiatric diseases are associated with increased mortality, Depressive Disorder is foremost among them. The death of Dr. Mirza was the consequence of a disease and not the result of a decision-making process. The depressive illness was endogenous in nature, i.e., it was not a response to some external stresses but the consequence of biochemical processes within the body. On January 17th Dr. Mirza, as the result of the above mentioned condition, made a homicidal attack upon his wife requiring his admission to a hospital. No criminal proceedings were instituted against Dr. Mirza since it was recognized that his behavior was not volitional in nature. Similarly, the self-destructive behavior of this individual was not deliberate in nature.
> My opinion is based upon review of extensive records and an interview with Dr. Mirza's widow.

We begin our analysis by noting that the Michigan cases addressing the scope of the "suicide, sane or insane" exclusion are far from legion. Indeed, the cases relied on by the parties are more than a century old.

In *Blackstone v Standard Life & Accident Ins Co,* 74 Mich 592; 42 NW 156 (1889), the insured caused his own death by slitting his throat with a razor. The defendant's policy excluded coverage for death "by suicide," but made no mention of "sane or insane." The plaintiff sought recovery on the ground that the insured was insane at the time he committed the fatal act and obtained a jury verdict in her favor after establishing this fact at trial.

Under what was then the majority rule, the Supreme Court affirmed the jury's verdict. After finding sufficient evidence to support a finding of insanity, the Court reasoned:

> The leading case upon the subject is that of *Ins Co v Terry,* [82 US] 15 Wall 580 [21 L Ed 236 (1873)], approving what had been known as "New York doctrine." In this case the policy was to be void if the insured should die by his own hand. Mr. Justice Hunt, after a full review of the cases, laid down the rule thus:
>
> "If the assured, being in the possession of his ordinary reasoning faculties, from anger, pride, jealousy, or a desire to escape from the ills of life, intentionally takes his own life, the proviso attaches, and there can be no recovery.
>
> "If the death is caused by the voluntary act of the assured, he knowing and intending that his death shall be the result of his act, but when his reasoning faculties as so far impaired that he is not able to understand the moral character, the general nature, consequences, and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse, which he has not

the power to resist, such death is not within the contemplation of the parties to the contract, and the insurer is liable."

*   *   *

The effect of this doctrine is that, in order to work a forfeiture under such a policy on the ground of self-destruction, the insured must have had sufficient mental capacity not only to understand that the act will destroy his life, but also to distinguish its moral quality and consequences,— the right and wrong of it,—and must perform the act, not under any uncontrolled impulse resulting from insanity, but voluntarily, with the intent to end his life; in other words, that it must be an act done with an evil motive. We think that this doctrine is supported by the great preponderance of authority in this country, and must be conceded to be the prevailing American doctrine; and it seems to us to be the safer and more reasonable and more consistent doctrine. [*Id.* at 609-610.]

Significantly, the Court went on to observe that the insurer could have drafted its policy so as to exclude coverage for insane suicide:

Policies issued by some life insurance companies contain a condition or provision that it shall be void if the insured shall die by suicide, felonious or otherwise, sane or insane; others provide, if the insured shall die by suicide, sane or insane; others provide for an avoidance, if the insured die by his own hand, sane or insane; while others provide for an avoidance if he shall die by his own act and intention, sane or insane. Such a condition, expressed in any of these forms, covers any case of voluntary self-destruction, and no kind or degree of insanity will prevent an avoidance; and the courts, not only in England, but in this country, have almost universally held that with such provisions in policies of life insurance the policies are void if the insured come to his death by his own hand. Some of those cases are cited by the learned

counsel for the defendant in their brief as having
some bearing upon the question now in issue. We
think they have no bearing upon the case where
· no such proviso is found in the policy. [*Id.* at 611.]

In direct response to cases such as *Blackstone,*
insurers began adding to their suicide exclusions
the language "sane or insane." See *Estate of Gallo-*
*way v Guaranty Income Life Ins Co,* 104 NM 627;
725 P2d 827 (1986); *Aetna Life Ins Co v McLaugh-*
*lin,* 380 SW2d 101 (Tex, 1964); anno: *Insurance:*
· *Construction of "sane or insane" provision of sui-*
*cide exclusion,* 9 ALR3d 1015. Our Supreme Court
dealt with just such an exclusion two years prior
to *Blackstone in Streeter v Western Union Mutual*
*Life & Accident Soc,* 65 Mich 199; 31 NW 779
(1887).

In *Streeter,* the defendant insurer issued a life
insurance policy excluding coverage if the insured
"die[d] by his own hand, sane or insane" within
three years of the date of issuance. Within that
period, the insured fell on a sidewalk, injuring the
base of his brain. Six weeks later, the insured shot
himself through the head. At trial, there was
testimony that the insured's mental state had
deteriorated to the point where he could not con-
trol his actions.

Although the exact procedural posture of the
case is unclear, the Supreme Court affirmed a
judgment in favor of the defendant insurer. In so
doing, the Court rejected the plaintiff's argument
that, by adding the words "sane or insane," the
insurer had done nothing to expand the scope of
the exclusion. In dicta, the Court stated that the
exclusion might not apply if it could be shown that
the insured acted involuntarily:

If a person does an act in a state of unconscious-

ness, or involuntarily, whether he be sane or
insane, such act is nothing more nor less than
accidental, and would not operate to forfeit the
policy. The record in this case does not disclose
such a state of facts. There was no evidence that
the act was involuntary, or that Mower was un-
conscious when he inflicted upon himself the fatal
wound. The only testimony which can be claimed
to have any bearing upon the subject is that given
in answer to questions calling for the opinion of
the witnesses as to whether Mower's insane men-
tal condition affected his ability to control his own
physical actions. These witnesses did not claim to
have been present at the time, or to have been
acquainted with the circumstances of the transac-
tion, but they used their opinion upon what they
had observed of his mental condition previous to
the act of self-destruction. Such testimony was
entirely destitute of any probative quality. The
court was right in disregarding it. The same point
was passed upon in *De Gogorza v Knickerbocker
Life Ins Co,* [65 NY 232 (1875)]. The policy covers
all conscious acts of the insured by which death by
his own hand is compassed, whether he was at the
time sane or insane. If the act was done for the
purpose of self-destruction, it matters not that the
insured had no conception of the wrong involved
in its commission. Upon the facts presented by this
record, the charge of the trial judge was correct.
[*Id.* at 202.]

In the present case, plaintiffs argue that sum-
mary disposition was improper because, unlike
*Streeter,* there is evidence in this case that dece-
dent's actions in hanging himself were involun-
tary. Plaintiffs point to the affidavit of Dr. Tanay
and argue that decedent's hanging was the result
of an irresistible impulse which negated any sui-
cidal intent. The essence of plaintiffs' position is
that, in light of modern psychological understand-
ing, a self-inflicted death resulting from an organic
depressive disorder is no more a "suicide" than

death resulting from any other internal medical illness. After thorough consideration, we find this argument to be unpersuasive.

Initially, we note that we do not find the dicta in either *Blackstone* or *Streeter* to be dispositive. Accordingly, we look to other jurisdictions.

The "irresistible impulse" issue was recently addressed by the California Supreme Court in *Searle v Allstate Life Ins Co,* 38 Cal 3d 425; 212 Cal Rptr 466; 696 P2d 1308 (1985). In *Searle,* the court held that an exclusion for "suicide, whether sane or insane" did not apply if the insured did not understand the physical nature and consequences of the act.[1] Such an impairment of the insured's faculties, the court held, would negate suicidal intent. However, in remanding the case for a new trial, the court held that an irresistible impulse would not negate such intent:

> The trial court instructed the jury that Searle had the burden of proof not only on the issue of suicidal intent but also on Martin's lack of "mental capacity to govern his own conduct at the time he shot himself." . . . Since the jury found against Searle on both issues, it is unclear what effect the trial court would have given to a verdict that Martin lacked capacity to govern his own conduct even though he was able to form a suicidal intent at the time he shot himself. For guidance on retrial, we consider the relevance, if any, of a

[1] In so doing, the court adopted the minority rule which holds that an act of self-destruction under such circumstances is not intentional suicide. Whether or not Michigan adheres to this rule is unclear. See, generally, *Ann Arbor Trust Co v North American Co for Life & Health Ins,* 527 F2d 526, 527 (CA 6, 1975), cert den 425 US 993 (1976). However, we need not resolve the matter, because the precise question is not before us. Dr. Tanay's affidavit cannot be read to support the inference that decedent was so insane that he did not understand that hanging himself would result in death. Indeed, such a contention would be inconsistent with plaintiffs' claim that decedent was bent on self-destruction. The sole matter at issue is whether an irresistible impulse is sufficient to negate suicidal intent.

finding of inability to govern one's conduct. To put it another way, we consider whether suicidal intent can be negated by proof that the decedent killed himself under the compulsion of an irresistible impulse.

We think not. As already explained, insanity or other mental derangement does not negate suicidal intent if the decedent is shown to have performed the self-destructive act with an understanding of its physical nature and consequences. Proof that the act was impelled by an irresistible impulse would merely establish that "self-destruction was the very result intended, albeit by a deranged mind." (*Johnson v Metropolitan Life Insurance Company*, [404 F2d 1202, 1204 (CA 3, 1968)]). Thus, proof of the irresistible impulse would not be inconsistent with a finding of suicide while insane. (*Ibid.; Nielsen v Provident Life and Acc Ins Co*, (1979) 100 Idaho 223; 596 P2d 95, 98; *Strassberg v Equitable Life Assur Soc*, (Sup Ct 1949) 196 Misc 387; 91 NYS2d 903; *National Life Ins Co v Watson*, (1922) 194 Ky 355; 239 SW 35). [*Id.*, 38 Cal 3d 440-441.]

In the *Johnson* case, relied on by the court in *Searle*, the United States Court of Appeals for the Third Circuit affirmed an order of summary judgment in favor of the insurer on the basis of a two-year policy exclusion for "suicide, sane or insane." However, the decision of the district court in *Johnson* contains the more cogent and instructive rationale regarding the issue. In *Johnson*, the insured took his own life by spreading fuel oil about his home and upon himself and igniting it. In opposing the defendant insurer's motion for summary judgment, the plaintiff raised the precise argument offered by plaintiffs here: "[T]he notion that insanity producing an irresistible impulse to do the destructive act negates the necessary volitional intent for 'suicide.'" *Johnson v Metropolitan Life Ins Co*, 273 F Supp 589, 593 (D NJ, 1967). The

district court rejected this argument, reasoning as follows:

> Plaintiff's remaining position, then, is that her husband's insanity, assuming it be proved, may have been of such a nature that he was irresistibly compelled by impulse to immolate himself, and therefore, that his action was no more the product of a conscious intent that [sic] would be a purely accidental act, e.g., the inadvertent discharge of a gun, on the part of a sane insured.
>
> In this regard, one must be careful to distinguish questions of intent and questions of motive. Psychoanalytically oriented and other schools of "depth psychology" have made the notions of "unconscious" or "subconscious" motive common parlance. But it is not helpful to define "suicide" as an intentional self-destruction, and then to confuse the slippery notion of "intent" with its underlying causes.
>
> Whatever the constellation of drives, impulses or subconscious motives which cause the subject to perform a given act, unless that act is actually inadvertent, its physical execution is "intentional" in the ordinary sense of the word. In short, my motive for doing, or impulse to do, the act is one thing; the fact that I therefore intend to do it and do so is a separate point and one that is not here in doubt. To the extent that Richard Johnson clearly understood the fatal consequences of his actions, his self-destruction was intentional suicide. [*Id.* at 594.]

The district court further dismissed the plaintiff's assertion that "the mantle of modern psychiatric knowledge" compelled a different result:

> If anything, modern psychology and psychiatry, particularly has counseled that the line between volition and irresistible impulse, conscious and unconscious motive is a murky and uneven one. If it has been necessary to open this Pandora's box in

the sphere of criminal responsibility and to apply our imprecise tools as best we can, most courts have, I think wisely, kept it shut on the present issue by giving the "suicide, sane or insane clause" its plain, intended meaning. As the Supreme Court sensibly pointed out almost a century ago, it is precisely to avoid such imponderables that the insurer inserts the modifying language. *Bigelow v Berkshire Life Ins Co* [93 US 284, 286; 23 L Ed 918 (1876).] [*Id.* at 594-595.]

We find this reasoning to be well-founded and highly persuasive. We therefore hold that proof that the insured acted as a result of an irresistible impulse in taking his own life does not negate suicidal intent. Accordingly, we conclude that the trial court did not err in ruling that the affidavit or Dr. Tanay failed to raise a genuine issue of material fact concerning the applicability of the policy exclusion.

Affirmed.