### Life Insurance Company *v.* Terry.

In the case of a policy of life assurance, where there is a condition in the instrument that if the assured shall " die by his own hand," the policy shall be void, the rules to be applied in case of the death of the party by such means, are these, that is to say:

If the assured, being in the possession of his ordinary reasoning faculties, from anger, pride, jealousy, or a desire to escape from the ills of life, intentionally takes his own life, the proviso attaches, and there can be no recovery.

If the death is caused by the voluntary act of the assured, he knowing and intending that his death shall be the result of his act, but when his reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, consequences, and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse, which he has not the power to resist, such death is not within the contemplation of the parties to the contract, and the insurer is liable.

ERROR to the Circuit Court for the District of Kansas.

Mary Terry brought an action in the court below against the Mutual Life Insurance Company of New York, to recover the sum of $2000, claimed by her as due upon a policy of in-

---

surance on the life of her husband George Terry, made and issued to her as his wife.

The policy contained a condition, of which a portion was in these words:

"If the said person, whose life is hereby insured, . . . shall die by his own hand, . . . this policy shall be null and void."

Within the term of the policy, George Terry died from the effects of poison taken by him.

Evidence was given tending to show that at the time he took the poison he was insane. Evidence was also given tending to show that at that time he was sane, and capable of knowing the consequences of the act he was about to commit.

Thereupon the counsel for the defendant requested the court to instruct the jury thus:

"*First.* If the jury believe from the evidence in the case, that the said George Terry destroyed his own life; and that, at the time of self-destruction, he had sufficient capacity to understand the nature of the act which he was about to commit, and the consequences which would result from it, then, and in that case, the plaintiff cannot recover on the policy declared on in this case.

"*Second.* That if the jury believe from the evidence that the self-destruction of the said George Terry was intended by him, he having sufficient capacity at the time to understand the nature of the act which he was about to commit, and the consequences which would result from it, then, and in that case, it is wholly immaterial in the present case that he was impelled thereto by insanity, which impaired his sense of moral responsibility, and rendered him, to a certain extent, irresponsible for his action."

The court refused to give either of these instructions, and charged as follows:

"It being agreed that the deceased destroyed his life by taking poison, it is claimed by defendant that he 'died by his own hand,' within the meaning of the policy, and that they are, therefore, not liable.

"This is so far true that it devolves on the plaintiff to prove such insanity on the part of the decedent, existing at the time he took the poison, as will relieve the act of taking his own life from the effect which, by the general terms used in the policy, self-destruction was to have, namely, to avoid the policy.

"It is not every kind or degree of insanity which will so far excuse the party taking his own life as to make the company insuring liable.

"To do this, the act of self-destruction must have been the consequence of the insanity, and the mind of the decedent must have been so far deranged as to have made him incapable of using a rational judgment in regard to the act which he was committing.

"If he was impelled to the act by an insane impulse which the reason that was left him did not enable him to resist, or if his reasoning powers were so far overthrown by his mental condition that he could not exercise his reasoning faculties on the act he was about to do, the company is liable. On the other hand, there is no presumption of law, *primâ facie* or otherwise, that self-destruction arises from insanity, and if you believe from the evidence that the decedent, although excited, or angry, or distressed in mind, formed the determination to take his own life, because, in the exercise of his usual reasoning faculties, he preferred death to life, then the company is not liable, because he died by his own hand within the meaning of the policy."

The cause came to this court on exceptions to the refusal of the court to give the instructions requested by the insurance company, and to the charge which was actually given.

The case was submitted on briefs; where it was elaborately argued on principle and precedents by *Messrs. H. E. and J. T. Davies, for the plaintiff in error:* the English case of *Borradaile* v. *Hunter** being referred to as the leading one, where the rule, it was said, was early settled in England against the pretensions of cases like the present, and settled in accord with what the counsel maintained was a just construction of the words of the contract; a case, it was urged, which had been supported by the weight of authorities both

---

* 5 Manning & Granger, 639.

in England and with us; as *Clift et al.* v. *Schwabe*,[*] *Dufaur* v. *Professional Life Insurance Co.*,[†] *Cooper* v. *The Massachusetts Mutual Life Insurance Co.*,[‡] *Nimick et al.* v. *Mutual Life Insurance Co.*,[§] and *Gay* v. *Union Mutual Life Insurance Company of New York.*[||]

*Mr. W. W. Nevison*, *contra*, relied on *Breasted* v. *The Farmers' Loan and Trust Co.*,[¶] *Barrett* v. *Buxton*,[**] *State* v. *Felter*,[††] and submitted that the charge of the court below was in truth sustained by the Circuit Court for Connecticut, in *Gay* v. *Union Mutual Life Insurance Co.*, relied on by the other side.

Mr. Justice HUNT delivered the opinion of the court.

The request for instructions made by the counsel of the insurance company, proceeds upon the theory that if the deceased had sufficient mental capacity to understand the nature and consequences of his act, that is, that he was about to take poison, and that his death would be the result, he was responsible for his conduct, and the defendant is not liable; and the fact that his sense of moral responsibility was impaired by insanity, does not affect the case.

The charge proceeds upon the theory that a higher degree of mental and moral power must exist; that although the deceased had the capacity to know that he was about to take poison, and that his death would be the result, yet, if his reasoning powers were so far gone that he could not exercise them on the act he was about to commit, its nature and effect, or if he was impelled by an insane impulse which his impaired capacity did not enable him to resist, he was not responsible for his conduct, and the defendant is liable.

It may not be amiss to notice that the case does not present the point of what is called emotional insanity, or *mania*

---

[*] 3 Manning, Granger & Scott, 437.
[†] 25 Bevan, 602.
[‡] 102 Massachusetts, 227.
[§] 10 American Law Register, New Series, 101.
[||] 9 Blatchford, 142.
[¶] 4 Hill, 73 ; S. C. on appeal, 4 Selden, 299.
[**] 2 Aikens, 167.
[††] 25 Iowa, 67.

*transitoria*, that is, the case of one in the possession of his ordinary reasoning faculties, who allows his passions to convert him into a temporary maniac, and while in this condition, commits the act in question. This case is expressly excluded by the last clause of the charge, in which it is said that anger, distress, or excitement, does not bring the case within the rule, if the insured possesses his ordinary reasoning faculties.

The case of *Borradaile* v. *Hunter*, reported in 5th Manning & Granger,* is cited by the insurance company. The case is found also in 2 Bigelow, Life and Accident Insurance Cases,† and in a note appended are found the most of the cases upon the subject before us. The jury found in that case that the deceased voluntarily took his own life, and intended so to do, but that at the time of committing the act he was not capable of judging between right and wrong. Judgment went for the defendant, which was sustained upon appeal to the full bench. The counsel for the company argued that where the act causing death was intentional on the part of the deceased, the fact that his mind was so far impaired that he was incapable of judging between right and wrong did not prevent the proviso from attaching; that moral or legal responsibility was irrelevant to the issue. The court adds: "It may very well be conceded that the case would not have fallen within the meaning of the condition had the death of the assured resulted from an act committed under the influence of delirium, or if he had, in a paroxysm of fever, precipitated himself from a window, or, having been bled, removed the bandages, and death in either case had ensued. In these and many other cases that might be put, though, strictly speaking, the assured may be said to have died by his own hands, the circumstances clearly would not be such as the parties contemplated when the contract was entered into." In delivering the opinion of the court Erskine, J., says: "All that the contract requires is, that the act of self-destruction should be the voluntary

---

* Page 639.                            † Page 280.

and wilful act of a man having at the time sufficient powers
of mind and reason to understand the physical nature and
consequences of such act, and having at the time a purpose
and intention to cause his own death by that act, and the
question whether at the time he was capable of understand-
ing the moral nature and quality of his purpose, is not rele-
vant to the inquiry further than as it might help to illustrate
the extent of his capacity to understand the physical char-
acter of the act itself." Chief Justice Tindal dissented from
the judgment. In speaking of the verdict he says: "It is
not, perhaps, to be taken strictly as a verdict that the de-
ceased was *non compos mentis* at the time the act was com-
mitted, for if this latter is the meaning of the jury, the case
would then fall within that description mentioned in the
argument to be without the reach of the proviso, namely,
the case of death inflicted on himself by the party whilst
under the influence of frenzy, delusion, or insanity."

This authority was followed in *Clift* v. *Schwabe*,* where it
was substantially held that the terms of the condition in-
cluded all acts of voluntary self-destruction, and that, whe-
ther the party is a voluntary moral agent, is not in issue.

These decisions expressly exclude the question of mental
soundness. They are in hostility to the tests of liability or
responsibility adopted by the English courts in other cases
from Coke and Hale onwards. Coke said, "A little madness
deprives the lunatic of civil rights or dominion over prop-
erty, and annuls wills." But, to exempt from responsibility
for crime, he says "complete ignorance of the knowledge
of right and wrong must exist." Lord Mansfield holds the
legal test of a sound mind to be the knowledge of right and
wrong, of good and evil; of which the converse is ignorance
of knowledge of right and wrong, of good and evil. Lord
Lyttleton held the test to be the state called *compos mentis* or
sound mind. Lord Erskine† defined it to be the absence of
any practicable delusion traceable to a criminal or immoral

---

* 3 Common Bench, 437.               † Defence of Hadfield.

act. In Pritchard, on the Different Forms of Insanity,* will be found the somewhat lengthy definition of insanity by Lord Lyndhurst.

The English judges refuse to apply to the act of the insured in causing his death the principles of legal and moral responsibility recognized in cases where the contract, the last will, or the alleged crime of such person may be in issue.

In *Hartman* v. *Keystone Insurance Co.,*† the doctrine of *Borradaile* v. *Hunter* was adopted, with the confessedly unsound addition that suicide would avoid a policy, although there were no condition to that effect in the policy.

In *Dean* v. *Mutual Life Insurance Co.*‡ the courts of Massachusetts held substantially the doctrine of *Borradaile* v. *Hunter*.

In Kentucky, in *St. Louis Life Insurance Co.* v. *Graves,*§ the court were divided upon the question of the soundness of *Borradaile* v. *Hunter*, but held unanimously that, where the suicide was committed during an uncontrollable passion caused by intoxication, the condition was broken and the policy avoided.

In *Cooper* v. *Massachusetts Life Insurance Co.*‖ the doctrine of *Dean* v. *American Life Insurance Co.* was affirmed; the plaintiff offering to prove that the deceased was insane at the time he committed the act; that he acted under the influence and impulse of insanity, and that his act of self-destruction was the direct result of his insanity.

In *Nimick* v. *Insurance Company,*¶ McKennan, Circuit Judge of the United States for the Western District of Pennsylvania, held that if the assured comprehended the physical nature and consequences of the act, and intended to destroy his life, the policy was void, although he did not comprehend the moral nature of the act.

---

* Vol. 1, p. 16; and see 1 Shelford on Lunatics, 46.
† 21 Pennsylvania State, 466.     ‡ 4 Allen, 96.
§ 6 Bush, 268.     ‖ 102 Massachusetts, 227.
¶ 10 American Law Register, New Series, 102.

On the other hand, in *Eastabrook* v. *Union Insurance Co.*,[*] the judge at the trial instructed the jury "that if the insured was governed by irresistible or blind impulse in committing the act of suicide, the plaintiff would be entitled to recover." This decision was sustained by the Supreme Court of the State of Maine.

In the State of New York the question arose in *Breasted* v. *Farmers' Loan and Trust Co.*[†] In an action upon the policy the defendants pleaded that the deceased committed suicide by drowning himself in the Hudson River, and died by his own hand. To this the plaintiff replied that the assured was "of unsound mind and wholly unconscious of the act." The defendants demurred. The Supreme Court overruled the demurrer, holding that the reply afforded a sufficient answer to the plea. The case afterwards came before the Court of Appeals of that State,[‡] when it was held that the provision in the policy had reference to a criminal act of self-destruction, that the self-destruction of the insured while insane, and incapable of discerning between right and wrong, was not within the provision.

In the case of *Gay* v. *The Union Mutual Life Insurance Co.*,[§] it was held that if the deceased was conscious of the act he was committing, if he intended to take his own life, and was capable of understanding the nature and consequences of it, the policy was void, but if the insured destroyed himself while acting under an insane delusion, which overpowered his understanding and will, or if he was impelled to the act by an uncontrollable impulse, the case did not fall within the proviso of the policy. This decision, it is stated by Bigelow,[||] was the result of a careful deliberation between Judges Woodruff and Shipman at a Circuit Court of the United States held by them jointly.

In his work on Insurance,[¶] Mr. Phillips, after citing the cases, closes thus: "And I take our law to be that any mental derangement which would be sufficient to exonerate

---

[*] 54 Maine, 224.   [†] 4 Hill, 73.   [‡] 4 Selden, 299.

[§] Cited in 2 Bigelow, Life and Accident Insurance Cases, 4.

[||] *Supra.*   [¶] Section 894.

a party from a contract would render a person incapable of occasioning the forfeiture of a policy under this condition."

There is a conflict in the authorities which cannot be reconciled.

The propositions embodied in the charge before us are in some respects different from each other, but in principle they are identical. They rest upon the same basis,—the moral and intellectual incapacity of the deceased. In each case the physical act of self-destruction was that of George Terry. In neither was it truly his act. In the one supposition he did it when his reasoning powers were overthrown and he had not power or capacity to exercise them upon the act he was about to do. It was in effect as if his intellect and reason were blotted out or had never existed. In the other, if he understood and appreciated the effect of his act, an uncontrollable impulse caused by insanity compelled its commission. He had not the power to refrain from its commission, or to resist the impulse. Each of the principles put forth by the judge rests upon the same basis,—that the act was not the voluntary intelligent act of the deceased.

The causes of insanity are as varied as the varying circumstances of man.

> ——"Some for love, some for jealousy,
> For grim religion some, and some for pride,
> Have lost their reason; some for fear of want,
> Want all their lives; and others every day,
> For fear of dying, suffer worse than death."*

When we speak of the "mental" condition of a person, we refer to his senses, his perceptions, his consciousness, his ideas. If his mental condition is perfect, his will, his memory, his understanding are perfect, and connected with a healthy bodily organization. If these do not concur, his mental condition is diseased or defective.

Excessive action of the brain whereby the faculties become exhausted, a want of proper action whereby the

---

* Armstrong on Health, book 4, v. 84. Cited in Shelford on Lunatics, In. 1, 48.

functions become impaired and diminished, the visions, delusions, and mania which accompany irritability, or the weakness which results from an excess of vital functions, indigestion and sleeplessness, are all the result of a disturbance of the physical system.    The intellect and intelligence of man are manifested through the organs of the brain, and from these, consciousness, will, memory, judgment, thought, volition, and passion, the functions of the mind, do proceed. Without the brain these cannot exist.    With an injured or diseased brain, their powers are impaired or diminished.

We have not before us the particular facts on which the questions of the sanity of Terry were presented.    We may assume that proof was given upon which the propositions of the charge were based.    We do not know whether he was sleepless, unduly excited, or unnaturally depressed; whether he had abandoned his accustomed habits and pursuits and adopted new and unusual ones; from a quiet, orderly man, had become disorderly, vicious, or licentious;—that his fondness for his wife and children changed to dislike and abuse; that jealousy, pride, the fear of want, the fear of death had overtaken him.    He may have realized the state supposed by the counsel in arguing *Borradaile* v. *Hunter*, viz., that his death might have resulted from an act committed under the influence of delirium, or that in a paroxysm of fever he might have precipitated himself from a window, or having been bled, he might have torn away the bandages.    Whether he swallowed poison or did the other insane acts, might result from the same condition of body and mind.

Delirium, fever, tearing away the bandages for preserving the life, the taking of poison, in a case like that before us, are all results of bodily disease.    If bodily disease in these or other forms overthrew Terry's reasoning faculties, in other words, destroyed his consciousness, his judgment, his volition, his will, he remained the form of the man only. The reflecting, responsible being did not exist.    In the language of the successful counsel in *Borradaile* v. *Hunter*, " In these and many other cases, though, strictly speaking, the assured may be said to have died by his own hands, the cir-

cumstances clearly would not be such as the parties contemplated when the contract was entered into."

That form of insanity called impulsive insanity, by which the person is irresistibly impelled to the commission of an act, is recognized by writers on this subject.* It is sometimes accompanied by delusions, and sometimes exists without them. The insanity may be patent in many ways, or it may be concealed. We speak of the impulses of persons of unsound mind. They are manifested in every form,—breaking of windows, destruction of furniture, tearing of clothes, firing of houses, assaults, murders, and suicides. The cases are to be carefully distinguished from those where persons in the possession of their reasoning faculties are impelled by passion, merely, in the same direction.

Dr. Ray, cited by Fisher,† approves the charge of the judge in Haskell's case, where he says: "The true test lies in the word *power*. Has the defendant in a criminal case the power to distinguish right from wrong, *and the power to adhere to the right and avoid the wrong?*"

The question of sanity has usually been presented upon the validity of an agreement, the capacity to make a will, or upon responsibility for crime. If Terry had made an agreement under the circumstances stated in the charge, a jury or a court would have been justified in pronouncing it invalid. A will, then, made by him, would have been rejected by the surrogate if offered for probate. If upon trial for a criminal offence, upon all the authorities, he would have been entitled to a charge, that upon proof of the facts assumed, the jury must acquit him.‡

We think a similar principle must control the present case, although the standard may be different.

We hold the rule on the question before us to be this: If

---

* See Blandford on Insanity—"Impulsive Insanity."

† Fisher on Insanity, p. 83.

‡ Freemen *v.* People, 4 Denio, 9; Willis *v.* The People, 32 New York, 719; Seaman's Society *v.* Hopper, 33 Id. 619; The Marquess of Winchester's case, 6 Reports, 23; Combe's case, Moore, 759.

the assured, being in the possession of his ordinary reasoning faculties, from anger, pride, jealousy, or a desire to escape from the ills of life, intentionally takes his own life, the proviso attaches, and there can be no recovery. If the death is caused by the voluntary act of the assured, he knowing and intending that his death shall be the result of his act, but when his reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, consequences, and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse, which he has not the power to resist, such death is not within the contemplation of the parties to the contract, and the insurer is liable.

In the present instance the contract of insurance was made between Mrs. Terry and the company; the insured not being in form a party to the contract. Such contracts are frequently made by the insured himself, the policy stating that it is for the benefit of the wife, and that in the event of death the money is to be paid to her. We see no difference in the cases. In each it is the case of a contract, and is to be so rendered as to give effect to the intention of the parties. Nor do we see any difference for this purpose in the meaning of the expressions, commit suicide, take his own life, or die by his own hands. With either expression, it is not claimed that accidental self-destruction, death in endeavoring to escape from the flames, or the like, is within the proviso.

JUDGMENT AFFIRMED.

Mr. Justice STRONG dissented.