## WATERS v. CONNECTICUT MUTUAL LIFE INS. CO.

*(Circuit Court, D. New Jersey.  ——, 1880.)*

LIFE INSURANCE—POLICY—"DIE BY HIS OWN HAND."—A man does not "die by his own hand," within the meaning of a clause in a life insurance policy, although he puts an end to his life, if impelled to the act by an insane impulse which he has not the power to resist, or commits the act without a knowledge, at the time, of its moral character, and its consequences and effects.

INSANITY.—"In law a man is insane when he is not capable of understanding (1) that a design is unlawful, or that an act is morally wrong; or, (2,) understanding this, when he is unable to control his conduct in the light of such knowledge."

*Thos. N. McCarter,* for plaintiff.

*Courtlandt Parker,* for defendant

*Assumpsit.*

NIXON, D. J., *(charging jury.)*  There are no controverted questions of law in the case.  It turns upon questions of fact, and it is the duty of the jury to determine these.  But a few suggestions will not be out of place.  The action is upon a contract, and we must so construe it as to give effect to the intention of the parties.  The contract was between the plaintiff and the defendant corporation.  The $2,500 payable upon the death of the husband was to be paid to the wife— not an unusual, and in many cases a proper, method of making provision for a family by a husband, where the family depends upon his earnings for support.  On the fifteenth of October, 1862, the plaintiff obtained a policy for the sum of $2,500 in the defendant company, payable to her on the death of her husband, or in the event of her death before his decease then payable to her children.  No question is made but that the annual premiums were duly paid to the company from the date of the insurance to the death of the assured. It is sufficient for the purposes of this case to say that the company inserted in the policy, and the plaintiff agreed to the proviso, that nothing should be due and payable by the company if the assured, Matthew Waters, should "die by his own hand."  This expression is not to be taken literally.

In law, a man does not die by his own hand, although he puts an end to his life, unless he commits the act which results in death with a knowledge at the time of its moral character, and its consequence and effects.   Nor does he die by his own hand if he is impelled to the act by an insane impulse which he has not the power to resist.   Observe, gentlemen, that I speak of an insane impulse.   No matter how strong the impulse may be, or how wicked, if he be not insane, or if he has the power to resist, and does not choose to do so, the person acting under it dies by his own hand.

1. Your first inquiry will be, did the assured take his own life?   You will probably have no difficulty in deciding that question.   From the evidence it will be proper for you to infer that he was attending to his ordinary business in the usual way, and was in good health, on the 19th of July, 1877; that leaving his home in the earlier part of the evening, and after making one or two calls upon friends, he disappeared from mortal sight.   He was never seen alive again, but was found the next morning upon the floor of the office of his place of business, dead, with no marks of violence upon his person, and near him an empty glass, which had contained corrosive sublimate, and near to that the letter addressed to his brother in which he announced the fact of his intended self-destruction, and the reasons which impelled him to the course.   Such circumstances leave no room for reasonable doubt that, physicially, he died by his own hand.

2. You are then brought, gentlemen, to the next inquiry, was he insane at the time of the commission of the act which resulted in his death?

Your verdict hangs upon the decision of that question. And it is a difficult one, for it involves the definition of insanity, and the detection of its existence from the conduct of the individual.   What is insanity?   It may be defined generally to be a disease of the mind.   It is such a derangement of the mental faculties that the individual has lost the power of reasoning correctly.   But it differs so much in kind and degree that no precise definition can be given applicable to the varying circumstances of every case.   Medical men whose studies
19*

and observations are in the line of mental disorders seldom agree, either as to the definition of the disease, or as to the fact of its existence in a particular case. Dr. Hammond, in his work on Diseases of the Nervous System, (p. 332,) defines it to be "a manifestation of disease of the brain, characterized by a general or partial derangement of one or more faculties of the mind, and in which, while consciousness is not abolished, mental freedom is perverted, weakened or destroyed."

But this is too general for our present purposes. We want now, not a medical but a legal definition of insanity—one which will aid us in forming a correct judgment in the case under consideration. After carefully weighing the opinion of the supreme court of the United States, to which our attention has been called by both parties to this controversy, (*Terry* v. *Ins. Co.* 15 Wall. 590,) I have come to the conclusion (and I so charge you) that in law a man is insane when he is not capable of understanding (1) that a design is unlawful, or that an act is morally wrong; or, (2,) understanding this, when he is unable to control his conduct in the light of such knowledge. Bearing this definition in mind, what was the condition of Matthew Waters, the insured, on the evening of July 19, 1877? Doubtless, his latest utterances to the world are contained in the letter to his brother, and the counsel on both sides, in their able presentation of the case to your consideration, attempted to sustain their different theories largely, if not mainly, from its contents; the one counsel finding in the letter the most indubitable evidence of the insanity of the writer, and the other, the equally clear proof of his mental soundness.

It is not the province or the disposition of the court to express any opinion on the subject. The law casts that duty and responsibility upon you. But it is my province to say to you that in considering it you must dispossess your minds of all prejudice or partiality. You must allow your judgment and not your feelings to control you, and, placing yourself in such a frame of mind, you should consider the contents of the letter in the light of the circumstances which surrounded

the writer when it was penned.   Do its contents, interpreted
and explained by the evidence in the case in regard to his
mental peculiarities, and his business and family relations,
satisfy you in regard to the writer's insanity?   The law pre-
sumes him to be in his right mind, and the burden is upon
the plaintiff to prove the existence of such facts and circum-
stances as to convince your judgment that he was not so; or,
in other words, that he was not capable of understanding the
moral character of his act, or was urged on to its commission
by an insane impulse which he had not the power to resist.

I shall not detain you by recapitulating the evidence.   It
has been fairly stated to you by the counsel of the respective
parties.   It is rarely that a case is tried more ably or in a
better spirit.   But let us examine the letter more closely and
see whether we can ascertain, from its contents, the probable
causes or motives which impelled him to the act that he had
in contemplation when it was written.   It was addressed to
his brother, with whom he was engaged in business—not as
partner, but as an employe.   He writes as follows:

"Abe, I cannot live any longer with such a woman as my
wife, and her family.   She and they are perfect.   I and my
family are rascals, drunkards, gamblers, etc.   Whatever you
can do for my two daughters, do it; but as for my wife and
son George, let him and his mother and the unborn look out
for themselves.

"Look you well to what has been done, and mind rules
laid down for you.   Do not hire an assayer, but practice and
do it yourself.   You can if you will, by practice, as good as I
can.

"This step I hate and despise, but, whether I am to go to a
hell or a heaven, I am satisfied, and may God, who rules
over all, guide, direct and govern you and yours and mine in
the right and perfect way, and give you each a fortune here
and hereafter."

Then follow these directions in a handwriting quite changed
from the foregoing, as if written at a different time:

"My watch to Carrie, and my locket to Lulu, and chain

and tobacco box to you; my studs to George; my sleeve-but-tons to Lulu.

"Hoping that all will be satisfied more with my death than they have been with my life, and that my body may be buried along-side of my father, and not in my lot, I remain,

"Your brother,

"MATTHEW WATERS."

At the end of the letter, on the same sheet, and written in an almost illegible hand—as if penned in the last agonies of life—the following sentences were added:

"Smith is to have a good chance.   Let C. S. D. & Co. stand out in the 'cold.'                                       M. W."

"Wages are good, but self-respect is better.       M. W."

"Abe, see that my wife has no benefit.            M. W."

I shall detain you no further, except to add that the letter undoubtedly indicates an intention on the part of the writer to take his own life.

The plaintiff admits that the self-destruction was voluntary, and that the insured intended that death should be the result of his act; but she insists that his reasoning faculties were so far impaired that he was not able to understand the moral character, general nature, consequences and effect of the act; or, at least, that he was impelled to its commission by an insane impulse, which he had not the power to resist.

If a careful review of the whole testimony brings you to such a conclusion, your verdict will be for the plaintiff for $2,500, less $25, the amount of a note held by the company against the assured, with interest at 7 per cent. from November 3, 1877.

The defendant, on the other hand, insists that the insured was in the possession of his ordinary reasoning faculties, and intentionally took his own life from pride, jealousy, disappointment, or desire to escape from the troubles of life.

If such should be your judgment, your verdict will be for the defendant.

The jury found a verdict for the plaintiff for the full amount of her claim.