Stephenson, J.
 

 The rights of Hazel Brubaker, claimant herein, must be determined by the construction of Section 1465-68, General Code, which provides:
 

 “Every employe * * * who is injured, and the dependents of such as are killed in the course of em
 
 *619
 
 ployment, wheresoever such injury has occurred,
 
 provided the same was not purposely self-inflicted, * * *
 
 shall be paid such compensation out of the state insurance fund for loss sustained on account of such injury or death” etc. (Italics ours.)
 

 Brubaker’s claim for injury, made during his lifetime, is out of this case. An allowance was made to him and paid to the widow in satisfaction of such claim.
 

 The Workmen’s Compensation Fund, while neither a pension nor a gratuity, should be administered so as to serve the purposes of its creation. This court has held, time and again, that there can be no recovery for injuries except such as are traumatic in their nature. If Hazel Brubaker is permitted to recover in this case, it must be because her husband, Robert E. Brubaker, received an injury in the course of his employment, which injury produced mental derangement to the extent that he could not entertain a fixed purpose to take his own life and that the taking of his own life was the direct result of that lack of purpose that characterizes an insane mind. The mere fact of suicide presents no presumption of insanity. There is a general presumption that all men are sane until they are proven to be insane.
 

 The record in this case develops the fact that there was some delay in the allowance of Brubaker’s compensation by the Industrial Commission and because of this fact Brubaker began to worry and continued worrying, apparently because of the fact that such compensation had not been received and that he was becoming financially involved.
 

 It is a matter of common knowledge that insanity is evidenced by the departure of an individual from the normal conduct of his life. We find that there is a violent dispute in the record along this line. A number of witnesses testify that prior to Brubaker’s injury he was jolly and good humored, while others tes
 
 *620
 
 tify lie was grouchy and morose. The only testimony in the record bearing upon the question of causation is that of Dr. Ruby, and we quote it verbatim, together with his qualification:
 

 “Q. State your name. A. Eugene E. Ruby.
 

 “Q. And what’s your occupation? A. Osteopathic physician.
 

 “Q. I will ask you whether or not you treated Robert Brubaker? A. He presented himself to my office for treatment the first day of June.
 

 “Q. And what was the matter with him at that time, Doctor? A. The thing I have written here; pain in the right side of lumbar back and lower inguinal of the right side.
 

 ‘ ‘ Q. Now, how long did you treat him? A. I treated him up until the Friday before his death. Two or three times per week, I think there was some thirty treatments, thirty times he was in my office. Thirty or thirty-one, something like that.
 

 “Q. Did you know him before he came to your office in June? A. No, sir.
 

 “Q. Doctor, what was his condition at the time of his death as compared with his condition when he came to your office, was there improvement or not? A. Oh, I don’t think he showed much improvement.
 

 “Q. From the nature of that injury I wish you would state whether or not it was likely that he would ever have received a permanent cure? A. We held out that hope to him all the time.
 

 “Q. Now, what effect did that injury have upon his nervous condition, Doctor?”
 

 Objection was made to this question because the witness had failed to qualify. Thereupon, the following questions were asked and the following answers given:
 

 ‘‘ Q. How long have you practiced, Doctor? A. How long have I practiced?
 

 “Q. Yes. A. Beginning in 1915. Sixteen and a half years.
 

 
 *621
 
 “Q. And what school are you a graduate of? A. Kirksville College of Osteopathy and Surgery.
 

 “Q. Now, what effect did that injury have upon his nervous condition?”
 

 Another objection was interposed and the referee sustained the objection. Thereupon counsel for claimant stated: “I would like to answer it for the record.”
 

 The doctor answered as follows: “I don’t think you can say exactly what bearing this injury had upon his nervous condition, but it is my opinion that the fact that he wasn’t working, and couldn’t work, and he didn’t know whether he was going to work, all had a great deal of effect upon his mental depression is the way I decided, and in my opinion it was attributable to the injury. That’s what I thought at the time, I remember.”
 

 Hazel Brubaker knew more about her husband’s condition than any other person, because she had a better means of observing him. She testified that her husband was financially involved prior to his death; that a building and loan association held a mortgage on the home and that he expressed himself to the effect that he did not want to become a charge on her; that he worried when she worked in the garden and would sit on the steps and cry, and stated often that he could not stand it to live and be a cripple and have her take care of him; that he didn’t see how they would get along, as he couldn’t see any income for them to live on. He asked her how a person could kill himself and talked about a friend in Springfield who had killed his wife and committed suicide. During the course of the conversation he asked his wife where the temples were located, and she told him. He asked about the devolution of the property in case of his death. He had made a will in which he appointed his wife executrix. She was at one time reading to him concerning a will of a neighbor who had died, and he said to her: “You are our executor, aren’t you?” He worked at times for
 
 *622
 
 several days in repairing and cleaning up the shot gun with which he subsequently committed suicide. He worried because his wife did not have better clothing to wear.
 

 On the Sunday morning that he committed suicide he apparently talked quite a bit and his language does not indicate that he was suffering from melancholia. He waited until his wife had gone to Sunday school and then committed the act.
 

 As was stated by the Court of Appeals, insanity is difficult of proof. That is true, but this fact does not nullify the law in cases where it is required to be proven; and unless Brubaker at the time that he took his own life was insane to the extent that he could not entertain a fixed purpose to take his own life, then it must be assumed that he committed self destruction purposely, and his dependent cannot recover.
 

 From all the testimony there was no direct involvement of any nervous center. The best that can be obtained from the record is the fact of muscular strain. There was no brain injury and no spine injury.
 

 Under our law no recovery can be had for nervous shock unless the nervous shock is caused by physical injury. Of course this is not a negligence case, but the Workmen’s Compensation Law and the common law of negligence are pretty close together.
 

 The question here presented has never been passed upon by this court, but courts of last resort of other jurisdictions have had the question before them time and again. In the case of
 
 Kovalski
 
 v.
 
 New York, New Haven & Hartford Ry. Co.,
 
 116 Conn., 229, 164 A., 653, decided in 1933, it was held that the consequences of an injury for which workmen’s compensation may be awarded do not include unhappy mental or nervous states which do not pertain to the original injury except that they arise from the pendency of proceedings for compensation for the injury or anxiety because compensation may be terminated. The court in that
 
 *623
 
 case in effect held that there was a distinction between a mental state produced by worry and a neurotic condition produced by injury.
 

 Counsel cite a number of English cases, beginning with
 
 Holt
 
 v.
 
 Yates and Thom
 
 (1909), 3 B. W. C. C., 75 (C. A.), wherein it was held flatly that merely brooding over inability to work does not present a compensable case, as it is not traceable to the injury.
 

 In 1 Honnold on Workmen’s Compensation, 508, Section 132, the following rule is set out:
 

 “Where there follows as the direct result of a physical injury an insanity such as to cause the workman to take his own life through an unaccountable impulse or in a delirium of frenzy without conscious volition to produce death, having knowledge of the physical consequences of his act, there is a direct and unbroken connection between the injury and the death. But where the resulting insanity is such as to cause suicide through a voluntary willful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act, even though choice is dominated by a disordered mind, then there is a new and independent agency, which breaks the chain of causation arising from the injury.” Considering all the cases, mere mental derangement is not sufficient in a case of this character. It must go to the extent of destroying the free moral agency of the actor and be of such potency as to prevent him from fixing in his mind the purpose to commit self destruction.
 

 The learned court in the case of
 
 Withers
 
 v.
 
 London, B. & S. C. Ry. Co.,
 
 2 L. R., K. B. (1916), 772, 778, 85 L. J., K B., 1673, 1677, 115 L. T., 503, 506, 32 T. L. R., 685, 9 B. W. C. C., 616, 625, an English case, said:
 

 “I think, if we were to assent to the very able and interesting arguments which we have heard, we should be driven to this, that wherever we find an accident which involves, as so many accidents do, depression
 
 *624
 
 of spirits, particularly depression of spirits in the case of a naan who has been leading an active life as a labouring man or artisan, depression at being kept from his work and idling about at home, the neurasthenia and the suicide can all be traced directly to the accident. If we were to say that we should be opening a door, which, I think, we ought not to open.”
 

 The case of
 
 Life Ins. Co.
 
 v.
 
 Terry,
 
 82 U. S. (15 Wall.), 580, 21 L. Ed., 236, is cited by counsel and certainly states good law. This case was an action upon an insurance policy, which had the following suicide clause in it:
 

 “If the said person, whose life is hereby insured, * * * shall die by his own hand, * * * this policy shall be null and void.”
 

 The court allowed a recovery in that case, but a careful examination of the case will develop the fact that the insanity of the insured'was proven beyond all question. It is always assumed that a man is clothed in his right mind and is able to act wilfully and purposely. If his mentality is such that he cannot will or purpose, then it is not his act because he has not willed it.
 

 The question as to whether or not insanity exists is a question for the jury when the evidence is of such character that upon consideration thereof reasonable minds might reach different conclusions upon such question. But all the testimony we have in this case that even approaches medical testimony is that of the osteopath who says that “the fact that he wasn’t working, and couldn’t work, and he didn’t know whether he was going to work, all had a great deal of effect upon his mental depression is the way I decided, and in my opinion it was attributable to the injury.”
 

 Analyzing this testimony, the doctor simply testified that the facts that Brubaker was injured, and was not working, and could not work, and did not know whether he was going to work, had an effect upon his
 
 *625
 
 mind. In other words, he worried because he was injured, not because the injury directly affected his nervous system so as to produce worry.
 

 This court will not weigh testimony; but we are unable to find in this record any testimony from which reasonable minds could reach different conclusions.
 

 Adverting to one proposition, claim is made that the Industrial Commission had X-ray photographs made of this man and that they were not produced in court. These radiographs might have shed some light upon the claim herein made, and counsel for claimant properly contend that they were unfavorable to the Industrial Commission or the Industrial Commission would have offered them in evidence. That contention is correct; but such failure does not add to the supply of evidence in this record.
 

 The judgment of the Court of Appeals and that of the Court of Common Pleas is reversed and final judgment rendered for plaintiff in error.
 

 Judgments reversed.
 

 . Weygandt, C. J., Williams, Jones, Matthias, Day and Zimmerman, JJ., concur.