IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 00-20639

---

AIG LIFE INSURANCE COMPANY,

Plaintiff-Appellee,

versus

BERTHA JACKSON BLACKSHEAR; ET AL,

Defendants,

TYLER EMMANUEL BLACKSHEAR; TAYLOR JASMINE BLACKSHEAR,

Defendants-Cross-Claimants-Appellants.

-----------------

EDDIE EMANUEL, JR.; CORY TARELL DAVIS,

Movants-Appellants,

versus

BERTHA JACKSON BLACKSHEAR,

Defendant-Cross-Defendant-Appellee.

---

Appeal from the United States District Court
for the Southern District of Texas
H-96-CV-2705

---

June 13, 2002

Before GARWOOD, WIENER, and CLEMENT,[1] Circuit Judges.

GARWOOD, Circuit Judge:[2]

Tyler Emmanuel Blackshear, Taylor Jasmine Blackshear, Eddie Emmanuel Blackshear Jr. and Corey Tarell Davis appeal the district court's grant of summary judgment in favor of defendant-appellee AIG Insurance Company on their suit for the proceeds of their father Eddie Blackshear Sr.'s accidental death and dismemberment policy. They also appeal the district court's distribution of the impleaded proceeds of Tamiki Blackshear's accidental death and dismemberment policy. We affirm.

### Facts and Proceedings Below

Eddie Blackshear Sr. (Eddie) was employed by Andrews Transport, Inc. (Andrews) as a gasoline truck driver. Andrews offered its employees a "cafeteria plan" of insurance coverage, including medical, dental, life and disability insurance, and a supplemental accidental death and dismemberment (AD&D) policy underwritten by AIG Insurance Company (AIG). Eddie purchased AD&D coverage for himself and his wife Tamiki.

Eddie and Tamiki had a stormy marriage which began to fall

---

[1]Judge Edith Brown Clement participated by designation in the oral argument of this case as a United States District Judge for the Eastern District of Louisiana. Since that time she has been appointed as a Fifth Circuit Judge.

[2]Pursuant to 5TH CIR. R.47.5 the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

apart after Tamiki moved out of their Conroe, Texas home in May 1995. On June 2, 1995, Eddie found Tamiki at a friend's house and assaulted her out of jealousy, biting her leg in the process. The next morning, Eddie visited his mother, where he reviewed his insurance documents. He also ransacked his sister's house, took her pistol, and went to the Shell gas station where Tamiki worked. Over the course of several visits that day, Eddie carried on a conversation with Tamiki that her co-worker Cricket Mann described as increasingly intense and argumentative. When Tamiki unequivocally told Eddie their marriage was over, he pulled out the pistol and pointed it at Tamiki. He then ordered Mann out of the store, saying "this isn't going to be pretty," and dragged Tamiki by the neck into a back storage room. Eddie shot Tamiki twice in the head, paused, and then shot himself in the temple. Police found a suicide note in Eddie's possession, which he had apparently written that morning.

Eddie's suicide note reflects the desire to punish Tamiki for "playing games," balanced with a fear of hell and an apology to Jesus for his lost faith. In despair that he had lost his family, Eddie wrote that he chose eternity in hell so that he could punish Tamiki. He concluded by bitterly and cruelly criticizing Tamiki's parents, Brenda and Henry Victoria.

The Victorias filed a Notice of Claim on Tamiki's policy and Eddie's mother Bertha Blackshear filed on Eddie's AD&D policy. AIG

3

conceded they owed the $120,000 proceeds of the policy on Tamiki's life, but were concerned that the proceeds belonged to Eddie and Tamiki's children, Tyler and Taylor Blackshear, minors who had not themselves filed a Notice of Claim. AIG therefore interpleaded the funds representing the proceeds payable under the policy on Tamiki's life in the district court and named the Victorias, Bertha Blackshear, Tyler and Taylor as defendants. In the complaint, AIG also denied payment of Bertha Blackshear's claim on the grounds that Eddie's death fell within the suicide exclusion of the policy on his life. Brenda Victoria responded with a cross-claim against Bertha Blackshear, arguing, as next friend of the children, that they should receive the proceeds of Tamiki's policy.

A state court appointed Brenda Victoria as guardian of the children.[3] She thereafter withdrew her own claim to Tamiki's policy and moved for summary judgment on Tyler and Taylor's behalf. The district court appointed Ursula Hall as attorney *ad litem* for Tyler and Taylor, and those children joined in the summary judgment motion. Tyler and Taylor cross-claimed for the proceeds of Tamiki's policy against Bertha Blackshear, now the executor of Eddie's estate. They also counterclaimed against AIG for failing to pay Eddie's policy, arguing it was payable because Eddie was insane at the time he took his life. Added to their demand for the proceeds of Eddie's policy were various state law counterclaims

---

[3]At about this time, Henry Victoria passed away.

related to bad faith and failure to investigate.

AIG then moved for summary judgment on Eddie's policy, arguing that his death was excluded from coverage by the policy's suicide clause. On August 6, 1998, the district court held that the AD&D policy only excluded "sane" suicide and therefore summary judgment was improper because issues of fact remained regarding Eddie's mental state. The court then took under advisement the summary judgment on Tamiki's policy and ordered AIG to implead Eddie's other two children, Eddie Blackshear Jr. and Corey Davis (each a minor). Because Bertha Blackshear declined to represent Eddie Jr.'s and Corey's interest, the court appointed Ursula Hall as attorney *ad litem* for them as well.

On March 15, 1999, AIG again moved for summary judgment and proffered expert testimony establishing the cause of Eddie's death and his mental state. AIG also argued that the policies were part of an ERISA plan and thus ERISA preempted any state-law counterclaims of the children. On June 30, 1999, the district court granted AIG's summary judgment in part, holding that the AD&D policy was an ERISA plan that preempted the state law counterclaims. The district court denied the motion, however, so far as it addressed Eddie's mental state.

After hearing evidence at a bench trial beginning July 7, 1999, the district court finally granted AIG's second summary judgment in full. The court held that even though Eddie suffered

5

from mental illness, his impulses were not irresistible. Instead, the district court held, Eddie intentionally and methodically committed suicide with full understanding of the moral consequences. The district court then disbursed the proceeds of Tamiki's policy in equal portions to her children Tyler and Taylor, implicitly rejecting the attorney ad litem's argument that Corey and Eddie Jr. were entitled to a share of the proceeds of Tamiki's policy under the Texas Simultaneous Death Act, TEX. PROB. CODE ANN. § 42. All four minor children have appealed.

## Discussion

We review a grant of summary judgment *de novo*, applying the same standards as the district court, while viewing all disputed facts and reasonable inferences "in the light most favorable to the nonmoving party." *Duffy v. Leading Edge* Prods., 44 F.3d 308, 312 (5th Cir. 1995). The appellants allege three points of error. First, they argue that the AD&D policy was not an ERISA "plan" and thus their state law claims should not have been preempted. Second, they argue that Eddie was insane at the time he took his life and thus they are entitled to the proceeds of his policy. Finally, they argue that the district court improperly distributed the proceeds of Tamiki's policy. We shall address each argument in turn.

*I.  The Insurance Policy Was an ERISA Plan*

This court explained the process for determining whether an

6

employee benefit is an ERISA-covered "employee welfare benefit plan" in *Hansen v. Continental Insurance Company*, 940 F.2d 971 (5th Cir. 1991). In *Hansen*, a worker had purchased an AD&D policy for himself and his family through his employer, Fairfield Industries. *Id*. at 973. Fairfield distributed printed materials with the Fairfield name and logo on them, and the materials contained a discussion of risk and a suggestion that workers consider accident insurance. *Id*. at 974. Moreover, Fairfield both collected the premiums and employed a full-time benefits administrator. *Id*. When his wife died, Hansen filed a claim for benefits under the policy. Continental Insurance disputed the amount due under the policy, and Hansen sued under various state law theories. *Id*. This court affirmed the district court's holding that the plan was an ERISA "employee welfare benefit plan" and thus his state law claims were preempted. *Id*. at 979. The court first considered whether the policy was excluded from ERISA coverage by the "safe harbor" provision of 29 C.F.R. 2510.3-1(j), holding that Fairfield's actions had sufficiently endorsed the plan to make that regulation inapplicable. *Id*. at 976-77. The court then asked whether the policy was a "plan," finding that it was. *Id*. at 977. The court finally asked whether the plan was established by the employer with the purpose of benefitting the employees, finding that Fairfield's purpose was exactly that. *Id*. at 978.

   *a. The AD&D Insurance Is Not Within The "Safe Harbor."*

7

First, we examine the "safe harbor" provision that excludes employee benefits from ERISA coverage when certain conditions are met. The parties agree that the AD&D insurance meets three of the four conditions, but dispute the application of the third listed requirement:

> "(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer." 29 C.F.R. § 2510.3-1(j)(3).

As was true in *Hansen*, Andrews's actions exceeded the restraint described in this provision. The printed materials provided to the employees carried the Andrews Transport name and do not clearly explain that the coverage is being offered by a third party, just as in *Hansen*. On the contrary, the handbook distributed by Andrews is entitled "Personal Accident Insurance Plan of Andrews Transport, underwritten by AIG Life Insurance Company." Andrews is listed as the plan administrator, whose powers include the "authority to control and manage the operation and administration of the plan." These descriptions suggest a degree of employer control and endorsement inconsistent with the regulation above. Appellants claim the handbook doesn't describe the AD&D policy, but the handbook only describes accident insurance and Andrews offers only one accident policy. Appellant also disputes the authorship of the handbook, but we find authorship less relevant than the fact that Andrews distributed these

8

materials bearing its name to its employees and thereby endorsed their contents.

Moreover, the booklet Andrews distributed lists accident statistics and urges the workers to give the plan careful consideration, a point the *Hansen* court held to be employer endorsement. Finally, as in *Hansen*, Andrews did not avoid administration of the plan but instead employed a full-time benefits administrator who collected claim forms for submission to AIG and explained the plan to employees. For all these reasons, Andrews's actions exceeded the minimal "sole functions" enumerated above and amounted to "endorsing" the policy. Thus, the AD&D policy cannot be excluded from ERISA protection under 29 C.F.R. § 2510.3-1(j)(3).

b. *The AD&D Insurance Was a "Plan."*

"Before a court can ask whether a plan is an ERISA plan, it must first satisfy itself that there is in fact a 'plan' at all." *Hansen*, 940 F.2d at 977. We must "determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." *Id*. (citing *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982)(en banc)). The Andrews AD&D insurance was a "plan." A reasonable person could ascertain that the insurance was a benefit for the employees of Andrews and their families, that premiums were paid by the

employees, and that benefits would be received by submitting claims to Andrews's full-time benefits administrator so they could be forwarded to AIG.

    *c.  The AD&D Plan Was an ERISA Plan.*

In examining whether a given insurance program was an ERISA plan, *Hansen* applied two tests. First, the court should "focus on the employer and its involvement with the administration of the plan," because "if an employer does no more than purchase insurance for her employees, and has no further involvement with the collection of premiums, administration of the policy, or submission of claims, she has not established an ERISA plan." *Hansen*, 940 F.2d at 978 (some punctuation and citations omitted). As in *Hansen*, Andrews provided a full-time benefits administrator who collected premiums and accepted claim forms. The first test is therefore met.

"In addition to some meaningful degree of participation by the employer in the creation or administration of the plan, the statute requires that the employer have had a purpose to provide health insurance, accident insurance, or other specified types of benefits to its employees." *Id*. (citing 29 U.S.C. § 1002(1)). The second test for ERISA plan status is therefore to examine whether the employer had an "intent to provide its employees with a welfare benefit program through the purchase and maintenance" of the policy. *Id*. (quoting *Memorial Hospital System v. Northbrook Life*

10

*Ins. Co.*, 904 F.2d 236, 241 (5th Cir. 1990)). Andrews demonstrated its intent to provide a welfare benefit program. It provided a benefit plan to its employees that listed the AD&D insurance as a supplement, and distributed materials that included the Andrews name and urged employees to carefully consider the plan as a "valuable supplement to your existing coverages." Just as in *Hansen*, Andrews intended to provide the supplemental accident insurance as a benefit to its employees.

The AD&D insurance offered by Andrews was an ERISA plan, and thus any state law counterclaims were preempted. *See* 29 U.S.C. § 1144.

## II. Eddie Blackshear Sr.'s Sanity

The parties agree that because the AD&D policy merely excludes the ambiguous term "suicide" and not "suicide, sane or insane," case law requires AIG to pay the policy if Eddie was insane when he took his own life. The standard for "insane suicide" was stated 130 years ago in *Mutual Life Insurance Company v. Terry*, 82 U.S. (15 Wall.) 580, 590-91 (1872):

> "We hold the rule on the question before us to be this: If the assured, being in the possession of his ordinary reasoning faculties, from anger, pride, jealousy, or a desire to escape from the ills of life, intentionally takes his own life, the proviso attaches, and there can be no recovery. If the death is caused by the voluntary act of the assured, he knowing and intending that his death shall be the result of his act, but when his reasoning faculties are so far impaired that he is not able to understand the moral character, the general

11

nature, consequences, and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse, which he has not the power to resist, such death is not within the contemplation of the parties to the contract, and the insurer is liable." *Id.*

The burden of establishing such insanity falls upon the beneficiaries. *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1097 (7th Cir. 1994). This court reviews the district court's grant of summary judgment *de novo*, as explained above.[4]

a. *Knowing and Able to Understand*.

We begin by applying the first part of the *Terry* test and asking whether Eddie took action while both "knowing and intending

_____

[4]This court normally reviews the fact determinations of the plan administrator for abuse of discretion, and such review is usually limited to the administrative record. *Schadler v. Anthem Life Ins. Co.,* 147 F.3d 388, 394-95 & n.7 (5th Cir. 1998). As to whether the plan administrator correctly interpreted the terms of the plan, if the plan vests the administrator with the power to construe it, we review that construction for abuse of discretion. *Id*. at 395. Otherwise, review thereof is *de novo*. *Id*.

From their first claim determination through their arguments in the district court, AIG relied on an issue of plan interpretation by insisting that there was no exception for insanity in the policy's suicide clause. The district court rejected this argument, and AIG has conceded the point before this court. We turn to the question of whether Eddie Sr. was insane. Because AIG denied the claim based on its interpretation of the policy language, however, this question was apparently neither adequately presented to nor ruled on by the plan administrator. Where the parties did not have an opportunity to present the relevant facts to the plan administrator, we are not limited to the administrative record on review. *See Schadler*, 147 F.3d at 395; *Wildbur v. ARCO Chemical Co*., 974 F.2d 631, 639 (5th Cir. 1992). While in *Schadler* we remanded to the plan administrator, in that case, unlike this one, the plan gave the administrator discretion to construe its terms. In any event, none of the parties request remand to the plan administrator, and AIG has conceded that *de novo* review of the district court's judgment is appropriate.

that his death shall be the result of his act" and "able to understand the moral character, the general nature, consequences, and effect of the act." Eddie's suicide note demonstrates that he met that standard. Through that writing, it is clear that Eddie did not suffer from delusions or misapprehensions regarding the act; he was plainly aware that his action would result in his death. Moreover, there is no evidence or suggestion of physical impairment or drug or alcohol use that could have prevented Eddie from truly understanding what he was doing. Eddie's note also exhibits an understanding of the moral character of suicide, along with its general nature and consequences, because he discusses at some length the religious condemnation facing him. Yet, despite his firm belief that eternal punishment awaited him, he chose to trade damnation for the opportunity to kill his wife without going to jail. Eddie also understood that his act would leave his children as orphans, but expressed some happiness that the very sight of his children would bring sadness to his detested in-laws. The note shows that Eddie fully met the first *Terry* test.

Appellants argue that Eddie failed to appreciate that his goal of reuniting his family would be forever stymied by his acts, and this lack of appreciation means he failed to meet this test. We disagree. Eddie had no hope of reuniting his family; in his suicide note he expresses those desires but then laments that "that's all over now." His actions on June 3, 1995 show restraint

13

until Tamiki unequivocally told him that their marriage was over. Eddie waited to act until there was no hope of achieving his main goal, and thus nothing indicates that he failed to appreciate the consequences of his actions. Appellants also urge a "moral insanity" test based in John Stuart Mill's utilitarian philosophies, but that simply is without any support in the law (or in psychiatry).

b. *Irresistible Impulse.*

The second test in *Terry* asks whether the deceased was "impelled thereto by an insane impulse, which he had not the power to resist." The Supreme Court said that a substantially similar definition was: "able to distinguish between right and wrong, and know that the act is wrong, yet his will (by which I mean the governing power of his mind) has been, otherwise than voluntarily, so completely destroyed that his actions are not subject to it, but are beyond his control." *Ritter v. Mutual Life Insurance Company of New York*, 18 S.Ct. 300, 303 (1898) (quoting *Davis v. United States*, 17 S.Ct. 360, 378 (1897)). The appellants commend the definition in *Reinking v. Philadelphia American Life Insurance Company*, 910 F.2d 1210, 1216 (4th Cir. 1990), asking whether the person "lacked the ability to make a meaningful choice between committing and not committing suicide" because he lacked "the ability to assess the merits of the goal to be achieved."

Under all of these tests, Eddie demonstrated that he was not

14

subject to an irresistible impulse. Instead, his actions on June 3rd were methodical and calculated. Eddie wrote the suicide note and checked his insurance policy that morning, thus indicating that he was already planning his own death. Nevertheless, his actions with Tamiki were careful. Over the course of that long and often-interrupted conversation he attempted one last time to reunite with Tamiki, and he acted only when she unequivocally told him that their marriage was over. Even then, Eddie took the time to order the cashier out of the store and took Tamiki into a back room so that he would not be disturbed. Eddie was impulsive, but on that day he repeatedly demonstrated his ability to resist those impulses. Moreover, Eddie's calculated choice to trade damnation for revenge without imprisonment shows that he could assess the merits of his goal. There is no evidence sufficient to sustain a finding that Eddie's actions were the result of an inability to control himself.

    c. *Expert Evidence.*

The affidavits of experienced psychiatrists Drs. Coons and Reid, who reviewed all the relevant material, clearly reflect that Eddie was sane, knew and intended that his death would result from his act, was able to understand the moral character, nature and consequences of his action, and was not under an irresistible impulse. These affidavits further reflect that nothing in the reports of Dr. Bacon or Dr. Battin, relied on by appellants,

15

reflects otherwise, that Dr. Battin, a professor of philosophy without medical, psychiatric or relevant psychological education, was not qualified to render a psychiatric or psychological opinion as to Eddie's mental capacity when he committed suicide, and that the concept of "morally insane" urged by appellants and Dr. Battin "is not a recognized concept or diagnosis in the psychological/psychiatric community, nor has it been for over 150 years."

Appellants proffered evidence from Dr. Margaret P. Battin, Dr. Roger E. Foxall (a psychologist), and Dr. Robert J. Bacon (a psychiatrist). Though their testimony related to Eddie's mental state, we agree with the district court that it failed to raise an issue of material fact regarding Eddie's ability to resist his impulses or to understand what he was doing and the moral character, nature and consequences of his actions at the time he acted.

We therefore hold that under the undisputed evidence Eddie met the *Terry* definition of sanity at the time he took his life and that there is no evidence sufficient to sustain a finding that he did not.

*III.  Distribution of the Impleaded Funds*

The final issue on appeal regards the proper distribution of the proceeds of Tamiki's AD&D policy, which AIG impleaded into the registry of the court. The district court ordered attorney's fees

16

paid from the funds and then distributed the remainder in equal portions to Tyler and Taylor Blackshear. Appellants argue that the proper distribution would instead be one-eighth to Corey Davis, one-eighth to Eddie Blackshear Jr., three-eighths to Tyler Blackshear, and three-eighths to Taylor Blackshear. They arrive at this result by urging the effect of the Texas Simultaneous Death Act, TEX. PROB. CODE ANN. § 47(b), on insurance policies held as community property, claiming that one half of the proceeds must be distributed among Tamiki's two children and the other half distributed among all four of Eddie's children.

We disagree. Because Eddie murdered Tamiki, TEX. INS. CODE ANN. art. 21.21[5] applies. That statute says:

> "The interest of a beneficiary in a life insurance policy or contract heretofore or hereafter issued shall be forfeited when the beneficiary is the principal or an accomplice in willfully, bringing about the death of the insured. When such is the case, a contingent beneficiary named by the insured in the policy shall receive the insurance unless that contingent beneficiary was also a principal or an accomplice in willfully bringing about the death of the insured. If no contingent beneficiary is named by the insured in the policy or if all contingent beneficiaries named by the insured in the policy were principals or accomplices in willfully, bringing about the death of the insured, the nearest relative of the insured shall receive, said insurance." TEX. INS. CODE ANN. art. 21.21.

To the extent that Eddie would be entitled to any interest in the funds as a beneficiary or through the Simultaneous Death Act, art. 21.21 nevertheless distributes those funds via constructive trust

---

[5]The statute has been renumbered as TEX. INS. CODE § 1103.151, effective June 1, 2003.

17

directly to "the nearest relative of the insured." *See Bounds v. Caudle*, 560 S.W.2d 925, 928 (Tex. 1977). The statute transfers the funds without further reference to the policy and the funds never enter the possession of the killer. *Crawford v. Coleman*, 726 S.W.2d 9, 11 (Tex. 1987); *Farmers & Merchants Bank of Shamrock v. Helton*, 278 S.W.2d 352, 354-55 (Tex.Civ.App.—Amarillo 1954, writ ref'd n.r.e.). The entire amount therefore goes directly to Tamiki's "nearest relatives," Tyler and Taylor. *See* TEX. PROB. CODE ANN. § 38(a) (declaring descendants to be first to receive in intestacy). We therefore affirm the distribution of the funds ordered by the district court.[6]

## Conclusion

The evidence shows Eddie Blackshear Sr. was sane when he committed suicide and there is no sufficient evidence to support a finding that he was then insane, an issue on which appellants would bear the burden of proof at trial. AIG therefore acted properly by denying payment of his AD&D policy. Moreover, the AD&D policy offered by Andrews was an ERISA plan and thus any state law action based on that denial is preempted by ERISA. Finally, Tyler and

---

[6]The attorney *ad litem* argued that Corey Davis and Eddie Blackshear Jr. were entitled to a portion of the proceeds, yet purported to also represent Tyler's and Taylor's interests. Because we affirm the distribution to Tyler and Taylor, and because the interests of Corey Davis and Eddie Blackshear, Jr. have been vigorously and thoroughly defended throughout, we need not reach the conflict-of-interest problem that would otherwise have presented itself.

18

Taylor, the two children of Tamiki Blackshear, were entitled to the entire proceeds of her life insurance policy under the provisions of the Texas Insurance Code preventing slayers from profiting from their actions. The record does not present a genuine issue of material fact as to these matters. Accordingly, the orders of the district court granting summary judgment and distributing the impleaded funds are

AFFIRMED.

19